Sands *v.* Granite Mutual Insurance Company, Appellant.

Argued September 12, 1974.   Before WATKINS, P. J.,
JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and
SPAETH, JJ.

*Ira P. Tiger*, with him *Schnader, Harrison, Segal
and Lewis*, for appellant.

*Maurice M. Green*, for appellee.

OPINION BY CERCONE, J., December 11, 1974:

This appeal arises from a judgment for the plaintiff-
insured, Mr. Sands, in the amount of $10,000 after a
jury trial below.

The facts of the case, though tantalizingly incom-
plete in the record, may be stated as follows, giving the
plaintiff the benefit of all the favorable inferences and
interpretations to which he, as the verdict winner, is en-
titled: In April of 1966, Mr. Sands came to Universal
Insurance Agency in order to purchase insurance for
his 1964 Chevrolet.   At that time he told Universal's

employee that he wanted "to be fully insured under 10-20 and 5—fully insured . . .,"[1] but expressed no preference with regard to which insurance company was selected. Universal was a broker which solicited business for several insurance companies. Since Universal had previously transacted business with plaintiff on the same automobile, and since none of the relevant circumstances affecting plaintiff's insurability had changed to the point that additional information would be required, Universal asked only that plaintiff sign the insurance application form in blank. Plaintiff was willing to let Universal fill out the form on the basis of the information they had in their file. Universal accepted a premium payment and forwarded the completed application to defendant company, Granite Mutual Insurance Company (Granite) for approval.

Unfortunately for plaintiff, Universal neither explained nor mentioned to him that the insurance application form carried a waiver of uninsured motorists coverage which read as follows:

"Uninsured Motorist Coverage has been explained and offered to me and I do [   ] do not [   ] wish to accept this coverage at this time.

"I understand that if I have not accepted Uninsured Motorist Coverage at this time, I may at any time have such coverage added to my policy only by sending written request by certified mail, with $2.00 to the home office of the company and to take effect when written endorsement is issued by an authorized representative of the company."

For reasons which remain unknown, Universal checked the "do not" box on the application. Thereafter Granite accepted coverage and plaintiff received a copy

---

[1] These figures represent standard limitations of liability in the policy: $10,000 maximum per person per accident; $20,000 maximum per accident; and $5,000 maximum in property damage per accident.

of the policy which had been typed out by Universal on forms supplied by Granite, but he did not read its contents.

In April of 1967, at plaintiff's request, the policy was renewed and plaintiff again paid the premium as charged by Universal, directly to Universal which deducted its commission and sent the balance to Granite. Once again plaintiff signed the application in blank; however, this time Universal merely filled in the preliminary language identifying Mr. Sands, his policy number and so forth. Over the body of the application Universal printed in large letters "NO CHANGE." Coverage was accepted by Granite, and the policy again was prepared and forwarded to plaintiff by Universal. Once more plaintiff did not examine it.

In March of 1968, Universal sent plaintiff what was, ostensibly, a form renewal of policy notice informing plaintiff that his current insurance policy would lapse and that Universal had a new policy to replace it and that he could come to the office to discuss it if he wished. Handwritten at the bottom of the letter was the message: "Your policy expires April 8th. Please send $47.00 to renew your policy." Ironically, the form letter closed with the warning, in bold-faced type: "REMEMBER, WHEN YOU RIDE WITHOUT AUTO INSURANCE, YOU GAMBLE ALL YOU OWN." Heeding that grim caveat, plaintiff promptly called Universal to advise them that he wished to renew. He also informed them that he did not wish to pay for the insurance in $47.00 installments, but would rather pay the entire yearly premium as soon as possible. He immediately paid $100.00, and within two months paid the premiums in full. Universal, however, sent Granite neither a renewal application nor their share of plaintiff's payments.

In June of 1968, a car driven by an uninsured motorist struck a car in which plaintiff was a passenger, seriously injuring plaintiff. The driver of the automo-

bile in which plaintiff was riding carried uninsured motorist insurance, under which plaintiff collected the maximum, $10,000. Plaintiff then applied to Granite for payment under the policy which he believed to be then in force,[2] since the extent of his injuries, which was not in dispute, exceeded $20,000. Granite informed plaintiff that they had no record of his having insurance with them at the time of the accident, and denied coverage. Thus, the current litigation. For reasons not apparent in the record, neither plaintiff nor defendant joined Universal as a party in the instant case, nor was the employee of Universal through whom plaintiff dealt in matters of automobile insurance called as a witness by either party.

The two principal questions raised by this appeal concern the extent of Universal's authority to bind Granite to provide a contract of insurance; and, the validity of the purported waiver of uninsured motorists coverage which appeared in plaintiff's initial application for insurance.[3]

## I.

Granite's principal argument against the existence of authority in Universal to bind them to provide insurance coverage rests upon a distinction more useful in the insurance industry than in the law—the distinction between a broker and an agent.

The facts developed at trial clearly indicate that in the lexicon of the insurance world, Universal was a

---

[2] Plaintiff testified that until the accident he had never heard of uninsured motorists coverage. He stated that it was only upon his seeking the assistance of counsel that he learned about such protection.

[3] The appellant also challenged several portions of the trial court's instructions to the jury. Those contentions are answered, either explicitly or implicitly, in the larger discussion in text below and do not warrant individual treatment herein.

broker, and not an agent. From this premise Granite invites us to recognize that, generally speaking, "brokers" represent purchasers of insurance while "agents" represent sellers of insurance. Therefore, according to Granite, Universal was not an agent of Granite, and Granite was not bound by either its acts or failures to act. We reject this facile approach to the resolution of this problem. Whether or not Universal was an "agent" for Granite in the sense in which that term is used by insurance men (i.e., duly licensed as an agent by the state insurance commission), is not particularly relevant. The question is whether the operating agreement between Universal and Granite provided, or appeared to provide, that Universal could bind Granite subject to Granite's right to expressly reject a policy coverage by seasonably notifying the insured that coverage was refused. As Professor Keeton has stated in criticizing the courts' willingness to employ general descriptions to determine particular relationships in insurance marketing: "The terminology used in an agency contract is inconclusive and is often inconsistent with the distinctions [between soliciting or special agents and general agents]. It may happen that the agency contract refers to one as a soliciting agent but grants to him, expressly or by implication, limited authority to make contracts for the insurer in particular circumstances. Even if the term 'special agent' were reserved to designate such persons, it would be indefinite because of the multitude of possible variations in the authority granted." R. Keeton, Insurance Law 22-23 (1971).

The distinction between brokers and agents is no more helpful in ascertaining the extent of Universal's authority to bind Granite in the instant case. In fact, even if we were to determine that Universal was acting in part as an agent for plaintiff in procuring insurance for him, that would not preclude our finding

that Universal had simultaneous authority to bind Granite, albeit subject to Granite's not rejecting coverage subsequently. As our Supreme Court has stated: "[T]he fact that an agent has acted for both parties in the making of a contract cannot have the effect of invalidating the agreement so made when both principals, with full knowledge of the material facts, consented to the double agency." *Rossi v. Firemen's Ins. Co.,* 310 Pa. 242, 249 (1932). See also Restatement of Agency, 2d, §§391, Comment a, & 392.

The facts developed at trial in the instant case amply demonstrate that Universal had apparent, if not actual, authority to bind Granite, unless and until Granite notified the insured of the denial of coverage and refunded the premium to the extent it was not earned.[4]

First, plaintiff's exhibits, which included various application forms, policies and receipts, show that the prior periods of insurance began on April 8, 1966, and April 8, 1967, in both cases running for twelve-month terms. Yet, in neither case were the policies "approved" by the home office on or before April 8th. Usually such approvals did not occur for several weeks after the coverage purportedly began. If we accepted the insurance company's argument that the policies were not in force until approved by the home office, we would necessarily be finding that each year plaintiff purchased three to four weeks of insurance for which he received no coverage—the period of time between the "effective date" of the policy and its approval by the home office.

Second, the plaintiff produced his 1966-67 insurance policy from the records of Granite, which Granite did not repudiate and which listed Universal Insurance Agency as both an "Authorized Representative" and a

---

[4] This case, therefore, is substantially different from *Taylor v. Crowe,* 444 Pa. 471 (1971), where the Court concluded: "There was absolutely no evidence that Crowe was the agent of the insurance companies so as to make them liable for his misrepresentations."

counter-signatory of the insurance. By permitting Universal to hold itself out as an "Authorized Representative," Granite undercut its argument that Universal did not have at least the apparent authority to bind them to a contract of insurance. Indeed, the applications signed by plaintiff and submitted to Granite in 1966 and 1967 stated that an individual who waived uninsured motorists protection could add such coverage at any time by making an additional two dollar premium payment, the coverage "to take effect when written endorsement is issued by an authorized representative of the company." Thus, the documentary evidence supports the conclusion that "authorized representatives" could bind Granite and that Universal was such an authorized representative.

Finally, the president of Granite, Mr. Easterby, took the stand and admitted that Universal was permitted to set rates and deduct its commissions directly from the premium payments as it received them. In fact, compared with the other agencies which transacted business for Granite, Universal stood in a unique relationship— they were the only brokers who were permitted to establish insurance rates for Granite. Furthermore, in 1966 Universal and Granite both submitted an application to the Insurance Commissioner of the Commonwealth to license Universal as an agent for Granite. Although the insurance commission refused to grant the license, the application itself indicates the close working relationship between Universal and Granite.

As one commentator has suggested: "[w]here a broker holds himself out as a general agent, solicits a policy, collects a premium a part of which he retains as his commission according to his custom, and a policy is issued upon information procured by him, he is an agent of the insurer by implication as to the insured who, in good faith, dealt with him as such." 3 Couch on Insurance 2d, § 26:25 (1960). See also *Benanti v. Security*

*Ins. Co.,* 9 S.W. 2d 673 (Mo. 1928); *Mathews v. Marquette Cas. Co.,* 152 So. 2d 577 (La. App. 1963); *app. denied,* 153 So. 2d 880.[5]

The courts of Pennsylvania have long concurred in this principle. In *Thomas v. Western Ins. Co.,* 5 Pa. Superior Ct. 383 (1897), this court stated: "It requires no extended discussion or citation of authorities to establish the proposition that a person authorized to deliver a policy of insurance and receive and receipt for the premiums is the agent of the company for that purpose, and the payment of the premium to him is a good payment."

## II.

Granite's second contention is that even if Universal had the authority to orally bind Granite to a renewal of the outstanding insurance policy, the renewal would be on the same terms and conditions as the policy it replaced. Therefore, since plaintiff's initial application contained a waiver of uninsured motorists coverage, such coverage was not provided in the renewal policy

---

[5] Granite also argued that their relationship with Universal had ended prior to plaintiff's accident. However, if Granite and Universal had concluded their relationship prior to the time that plaintiff's policy came up for renewal, they should have notified plaintiff and others in his position if they wished to avoid liability arising from prior dealings with Universal. "[I]t may be necessary to give third persons notice of the fact of voluntary termination by the insurer in order to avoid a continuation of the agent's power to bind the insurer by contracts with third persons." 3 Couch on Insurance 2d, § 26:28 (1960). So far as plaintiff knew, Universal was still acting with authority to bind Granite when it offered to renew the insurance policy. The acceptance of this offer, which included an immediate and substantial premium payment, therefore bound Granite to provide coverage until it notified plaintiff to the contrary. *Id.* at § 26:50. In such cases payment to the insurer's agent is equivalent to payment to the insurer. *Gosch v. Firemen's Ins. Co.,* 33 Pa. Superior Ct. 496 (1907).

either. Granite argues that plaintiff's grant of authority to Universal to fill out the insurance application bound him to the representations made therein, one of which was his desire to reject uninsured motorists coverage. Furthermore, Granite contends plaintiff's failure to read either the applications or the policies does not exonerate him from responsibility for their contents.

It is of course ordinarily true that one is bound by the representations which he has authorized another to make on his behalf. Restatement of Agency, 2d, § 284 & Comment a. It is also hornbook law that one is not excused from contractual obligations simply because he has failed to read the writing: *Applebaum v. Empire State Life Assur. Soc.*, 311 Pa. 221 (1933). In the instant case, however, public policy considerations override the blackletter law—policy considerations which have been clearly stated by our Supreme Court.

In *Harleysville Mut. Cas. Co. v. Blumling,* 429 Pa. 389 (1968), the Court stated: "The purpose of the uninsured motorist law is to provide protection to innocent victims of irresponsible drivers . . . . [S]uch statutes are 'designed to give monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injuries through the negligent use of those highways by others.' " *Id.* at 395. See also *Pattani v. Keystone Ins. Co.,* 426 Pa. 332 (1967) ; *Katz v. American Motorist Ins. Co.,* 53 Cal. Rptr. 669 (1966). The legislative intent in enacting the uninsured motorist law therefore requires a liberal construction of the statute, and a pronounced propensity on the part of the courts to find coverage unless equally strong legal or equitable considerations to the contrary are present. We find this principle especially strong with regard to the instant case because the legislature amended the statute in January of 1969 to delete the option of rejecting un-

insured motorists coverage. See 40 P.S. § 2000 (1971). Courts frequently rely upon public policy in overriding explicit terms in the insurance contract, at least when the contract terms would operate to defeat the reasonable expectations of the insured, because insurance carriers are affected with a public interest and are in a better position to more equitably divide the risk of personal tragedy, insofar as such tragedy can be expressed in dollars and cents. See R. Keeton, Insurance Law 22, § 341-42 (1971).

Employing such policy considerations most recently our Supreme Court found in *Johnson v. Concord Mut. Ins. Co.,* 450 Pa. 614 (1973) that an insured had not voluntarily and intelligently relinquished his right to uninsured motorists coverage, despite an apparent waiver of such protection in the application for insurance. In so holding the Court pertinently stated:

" '[T]hat portion of the statute permitting rejection of uninsured motorist coverage detracts from the public policy considerations and must therefore be narrowly and strictly construed' . . . .

"Recognizing these previously expressed public policy considerations, we must conclude that a waiver of uninsured motorist coverage is effective only if the waiver manifests the intentional relinquishment of this legislatively granted right of insurance protection. . . . To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it . . . ." (Citations omitted.)

In the instant case plaintiff expressed to Universal his desire to be "fully insured." The unrefuted facts clearly indicate that Universal never explained to plaintiff that he was entitled to uninsured motorists coverage, much less what that coverage comprehended. Nor would one expect an informed applicant to decline such coverage. As one commentator has stated: "In those

states where the right of the policyholder to reject the coverage remains, the experience has been that only a minuscule percentage of the policyholders elect to reject. The average cost of coverage is so low as to discourage the thought of rejection. . . . The rates for higher obtainable limits remain comparably low when compared to the premium charged for bodily injury liability in the same policy." P. Pretzel, Uninsured Motorists 8 (1972). Under those circumstances we cannot find that Universal's rejection of uninsured motorists protection, based on plaintiff's authorizing Universal to fill out the application, constituted a valid waiver of such coverage, especially in light of his testimony that uninsured motorists coverage was never mentioned to him and his expressed desire to be "fully insured."

Judgment is affirmed.

JACOBS, J., concurs in the result.

WATKINS, P. J., dissents.

———

CONCURRING OPINION BY SPAETH, J.:

I join in Judge CERCONE's opinion and only wish to add a comment regarding practice.

This suit is based upon a written contract of insurance, yet no copy of the policy is included in the complaint (or anywhere else in the record), nor is its absence explained. This is a violation of Pa. R. C. P. No. 1019(h), and although presumably any objection is long since waived, it is no aid to this court to omit the document that is central to the controversy.

If the policy did contain a standard uninsured motorist clause (including a common law arbitration provision), and then the insured signed an agreement waiving that clause's protection, it would follow that the lower court had no jurisdiction over the dispute. This would be so because the arbitration provision in the uninsured motorist clause would vest jurisdiction in the

arbitrators to decide the validity of the agreement of waiver. Put differently, the agreement of waiver would be treated the same as would be any other claim by the company that the clause did not apply, and our Supreme Court has consistently held that even defenses going directly to the applicability of the common law arbitration clause (when the clause is present) are to be decided by the arbitrators, not the courts. *Hartford Ins. Group v. Kassler*, 227 Pa. Superior Ct. 47, 324 A.2d 521 (1974) (company alleged that the automobile in question was not "uninsured" as defined in the policy). *See also Allstate Ins. Co. v. McMonagle*, 449 Pa. 362, 296 A.2d 738 (1972) (company claimed policy had expired six days prior to accident); *Preferred Risk Mut. Ins. Co. v. Martin*, 436 Pa. 374, 260 A.2d 804 (1970) (company claimed that foster child was not covered by policy); *Allstate Ins. Co. v. Taylor*, 434 Pa. 21, 252 A.2d 618 (1969) (claimant alleged not to be member of policyholder's household); *National Grange Mut. Ins. Co. v. Kuhn*, 428 Pa. 179, 236 A.2d 758 (1968) (company alleged that third party was not an "uninsured motorist" under the terms of the policy).

Here, however, both parties have argued on the basis that there was no uninsured motorist clause in the policy. It can therefore be presumed that there was none.[1] This case is thus similar on its facts to *Johnson v. Concord Mutual Insurance Co.*, 450 Pa. 614, 300 A.2d 61 (1973), although the procedure employed was different. In *Johnson*, the issue was also the validity of a waiver of uninsured motorist coverage. The claimant brought

---

[1] It should be noted that if there were an arbitration clause in the policy, not even an explicit stipulation by both parties that they did not wish to submit the dispute to arbitration would properly take the dispute out of arbitration and into the courts. *Allstate Ins. Co. v. Taylor*, 434 Pa. 21, 252 A.2d 618 (1969); *accord, United Services Auto. Ass'n Appeal [Webb v. United Services Automobile Ass'n]*, 227 Pa. Superior Ct. 508, 515 n.6, 323 A.2d 737, 740 n.6 (1974).

an action in equity to reform the policy (an indication that the policy did not contain an uninsured motorist clause) ; he won below and the decree was affirmed on appeal, judgment being entered in favor of the claimant. Arbitrability is not mentioned in the opinion. The action in equity to reform the contract seems to be better procedure than a suit in assumpsit when the inclusion or exclusion of an uninsured motorist clause is in dispute.[2] This technical point of pleading, however, is no reason to discard the just result reached by Judge CERCONE, especially where appellant has not claimed that appellee has chosen the wrong form of action (even though its brief cites and discusses *Johnson*) and would be estopped to now. The defense of failure to state a claim upon which relief can be granted is waived if not raised sometime before the verdict. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974); Pa. R. C. P. No. 1032 (1).

---

[2] *Johnson* is distinguishable from cases such as *B. Axe Ent. v. N. E. Fire Ins. Co.*, 446 Pa. 119, 285 A.2d 462 (1971), and cases cited therein, which stand for the proposition that reformation can be and should be secured in an action at law where it is sought as an immediate prerequisite to obtaining a legal remedy. This rule is designed to prevent spurious equity jurisdiction, wherein a party sues for reformation and a decree that he is entitled to damages. *Johnson* tacitly recognizes that once it is decided whether the uninsured motorist coverage was waived there will probably be no need for a separate suit in assumpsit, which is the situation in the present case.