**Stephen B. TAYLOR and Moss Rehabilitation Hospital**

v.

**PHOENIX MUTUAL LIFE INS. CO.**

Civ. A. No. 77–1322.

United States District Court, E. D. Pennsylvania.

May 26, 1978.

A. Grant Sprecher, Philadelphia, Pa., for plaintiffs.

William H. Lowery, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

Plaintiff, Stephen B. Taylor, (Taylor) is an individual who was severely injured in a motorcycle accident on October 6, 1974, as the result of which he fractured his spine and is today confined to a wheelchair. He was hospitalized at Chestnut Hill Hospital from the date of accident until November 27, 1974, when he was transferred to Moss Rehabilitation Hospital (Moss), also a plaintiff herein, where bills were incurred in the amount of approximately $12,000.00 for which recovery is sought under a group insurance policy issued by the defendant, Phoenix Mutual Life Insurance Company (Phoenix) to the Trustees of Service Industry Group Service Fund, of which Taylor Exterminating Company, the employer of Stephen B. Taylor, was a member at the time of his unfortunate injury.

Based upon a seventeen-page stipulation of facts, consisting of seventy-two paragraphs, plus certain supplemental affidavits and other exhibits, presenting all relevant and material facts to the Court, both the plaintiffs and the defendant, respectively, seek partial summary judgment.

In construing and interpreting the policy, the insurance contract involved, certain established legal principles are applicable. Insurance contracts are contracts of adhesion, where the insurer prepares the policy for the purchaser having no bargaining power. Where a dispute arises, such contracts are construed strictly against the insurer. *Hionis v. Northern Mutual Insurance Company*, 230 Pa.Super. 511, 327 A.2d 363 (1974). If a defense is based upon an exception or an exclusion in a policy, the defense is an affirmative one and the bur-

den is on the defendant to establish it. *Weissman v. Prashker*, 405 Pa. 226, 175 A.2d 63 (1961).

Furthermore, an insurance contract will be given a reasonable interpretation in light of the particular subject-matter, situation and contemplation of the parties. *Daburlos v. Commercial Insurance Company of Newark, New Jersey*, 381 F.Supp. 393 (E.D.Pa.1974), *affirmed*, 521 F.2d 18 (3rd Cir. 1975). Pennsylvania courts will rely on public policy in overriding explicit terms in the insurance contract, at least when the contract terms would operate to defeat the reasonable expectations of the insured. *Sands v. Granite Mutual Insurance Co.*, 232 Pa.Super. 70, 331 A.2d 711 (1974).

While it is true that where a doubt exists as to the meaning of the language in an insurance contract such language is construed in favor of the insured, it is also true that where the language of the policy is clear and unambiguous, it cannot be construed to mean other than what it says. Such clear language must be given the plain and ordinary meaning of the terms. Where there is no ambiguity or lack of clarity, the law does not permit looking beyond the language of the contract. *Southeastern Pennsylvania Transp. Auth. v. Transit Casualty Co.*, 412 F.Supp. 839 (E.D. Pa.1976).

The sole issue before the Court is whether Moss is a "hospital" within the definition of that term as used in the group policy issued and whether Moss is, accordingly, entitled to reimbursement for the cost of services rendered to Taylor by Moss during his stay at Moss from November 27, 1974, to March 20, 1975. In reaching its decision the Court will consider the "stipulation of facts" filed by the parties, and various affidavits, depositions and other exhibits called to the attention of the Court in full and complete memoranda submitted to the Court by counsel in support of the motions filed. Not at issue at this time are allegations that an insurance agent misrepresented to Taylor the extent of the coverage.

Pertinent to the factual considerations involved and supplementing the stipulation of facts, we quote from pages 3 and 4 of plaintiffs' brief as follows:

"Plaintiffs, in addition to the Stipulation of Facts attached hereto as Exhibit 'A' the affidavits of James R. Neely of the Hospital Association of Pennsylvania which indicates that Moss would be classified by HAP as a short term hospital if their average patient stay was, today, less than thirty days, a fact which has been stipulated to in paragraph 50 of the Stipulation.

"Stephen B. Taylor's physician at Moss was Doctor LaFontant, whose affidavit is attached hereto as Exhibit 'B'. Doctor LaFontant affirms that the treatment received by Taylor at Moss was necessary not only to resolve existing medical problems at admission, including bed sores and a bladder infection, but also was medically necessary to prevent Mr. Taylor's certain lapse into acute medical distress. The parties have, in this regard, stipulated to the improvement of Taylor's overall physical condition at Moss as the result of his treatment.

"In summary Taylor was severely injured in a motorcycle accident on October 6, 1974 as the result of which he fractured his spine, lost the use of his legs, and is today confined to a wheelchair. He was hospitalized at Chestnut Hill Hospital from October 6, 1974 until November 27, 1974 when he was transferred directly to Moss for further treatment until March 20, 1975.

"At the time of his transfer to Moss, Taylor's overall condition had stabilized though he was afflicted with bed sores, a bladder infection and phlebitis. Mr. Taylor was completely bedridden at the time of his transfer, was catheterized and incontinent. During his stay at Moss Mr. Taylor was cured of his bed sores and bladder infection—which required a cystoscopic examination at Moss. Additionally Taylor was taught to move himself into a wheelchair and to otherwise attend to his personal needs. Services including occupational therapy, physical therapy, psychological counseling and testing were provided to Taylor. Upon his admission Taylor assigned his rights under Phoenix's policy to Moss."

Likewise supplementing the stipulation are the following facts also called to the Court's attention by the defendant:

"Taylor was hospitalized at Chestnut Hill Hospital immediately after his accident, and during his stay there he had neurosurgery performed on his spine. Taylor remained in Chestnut Hill Hospital from October 6, 1974, through November 27, 1974. Taylor was then moved to Moss because he needed, in his own words, '(r)ehabilitation, just to show me how to get around again'. (Stephen Taylor Depos. at 7). Taylor remained at Moss from November 27, 1974, to March 20, 1975. During his stay at Moss, Taylor received incidental medical attention; but he was in Moss primarily for rehabilitative care. At Moss, Taylor learned how to get out of bed, get dressed, to cook, and 'just more or less how to take care of myself again.' (Stephen Taylor Depos. at 8–9) Even Taylor's family realized that the bladder and phlebitis treatment he received at Moss could have been handled in Chestnut Hill Hospital and that 'the primary purpose for being transferred to Moss was (so) that he could get rehabilitative care . . .'. (Joan Taylor Depos. at 30–31) After his release from Moss on March 20, 1975, Taylor continued to incur medical expenses. In 1977 he underwent spinal fusion surgery at St. Francis Hospital in Wilmington, Delaware.

"Phoenix has already paid for the hospitalization charges at Chestnut Hill and at St. Francis, as well as for a great deal of other medical expenses. (Stipulation, ¶¶ 64, 71, 72 and Joan Taylor Depos. at 32). Phoenix has not paid for Taylor's expenses while at Moss. Phoenix does not believe that Moss is a hospital covered by Taylor's policy; and the parties have stipulated that Moss is classified not as a short-term general hospital, but rather as a long-term specialty hospital

which performs no surgery and is primarily a place for rehabilitative care. (Stipulation, ¶¶ 4, 32, 35, 52, 54, and 61)."

The definition of the term "hospital" as used in the policy is found in paragraph 70 of the stipulation of facts as follows:

## "RELEVANT POLICY PROVISIONS
## "COVERED EXPENSES

Covered expenses are the reasonable charges for such of the following services and supplies as are recommended or approved by a physician, surgeon or dentist as essential for the necessary treatment of a Covered Person's injury or sickness for which insurance is afforded hereunder, provided that a charge shall be deemed unreasonable if it exceeds the prevailing average charge (as determined by Phoenix Mutual) for the particular treatment, care, service, or supply made in the locality where the treatment, care, service or supply was received, taking into consideration the nature and severity of the injury or sickness in connection with which such charge was made:

"(1) Hospital Charges: Charges made by a hospital, in its own behalf, . .

## "DEFINITIONS . . .

'Hospital' means an institution which is engaged primarily in providing medical care and treatment to sick and injured persons on an in-patient basis and which fully meets all the requirements set forth in (1) or (2) below:

"(1) It is a short term, acute, general hospital which (a) is primarily engaged in providing by or under the continuous supervision of physicians, to in-patients, diagnostic services and therapeutic services for diagnosis, treatment, and care of injured or sick persons, (b) has organized departments of medicine and major surgery, (c) has a requirement that every patient must be under the care of a physician or dentist, (d) provides twenty-four hour nursing service by or under the supervision of a registered professional nurse (R.N.), (e) has in effect a hospital utilization review plan meeting the standards set

forth in section 1861(k) of United States Public Law 89–97 (Medicare) as amended from time to time, (f) is duly licensed by the agency responsible for licensing such hospitals, and (g) is not, other than incidentally, a place for rest, a place for the aged, a place for drug addicts or alcoholics, or a place for convalescent, custodial, education or rehabilitative care.

"(2) It is a psychiatric hospital as defined by Medicare, qualified to participate in and eligible to receive payments under and in accordance with the provisions of Medicare . . ."

Although we have considered the entire stipulation, particularly pertinent to our considerations are the following paragraphs thereof:

"1. Moss Rehabilitation Hospital requires that every patient be under the continuous supervision of a physician or dentist.

"2. Moss Rehabilitation Hospital provides twenty-four hour nursing service by or under the supervision of a registered professional nurse (R.N.).

"3. Moss Rehabilitation Hospital has in effect a 'utilization review plan' meeting the standards set forth in Section 1861(k) of the United States Public Law 89–97 (Medicare).

"4. Moss Rehabilitation Hospital is primarily a place for rehabilitative care. (This stipulation does not contain a definition of 'rehabilitative care'.) Moss Rehabilitation Hospital provides diagnostic and therapeutic services to patients. If a patient who is confined for rehabilitative care has or develops conditions which require diagnostic and therapeutic services, these services are either provided at Moss Rehabilitation Hospital or the patients are transferred elsewhere for treatment.

"5. Moss Rehabilitation Hospital is not a place, except incidentally, for rest, a place for the aged, a place for convalescent care, or a place for custodial care.

"6. If a patient who is admitted to Moss Rehabilitation Hospital for rehabilitative

care has or develops an acute illness, a diagnosis is made at Moss Rehabilitation Hospital and appropriate treatment is ordered, which treatment may consist of transfer to another institution.

"7. Moss Rehabilitation Hospital and Albert Einstein Medical Center ("Einstein"), a short-term, acute care, general hospital, are separate corporate entities, have their facilities on adjoining parcels of real estate, and are physically connected by means of a corridor. The real estate on which Moss Rehabilitation Hospital is situated is owned by Einstein and leased to Moss Rehabilitation Hospital by Einstein.

\*　　\*　　\*　　\*　　\*　　\*

"9. Some patients who are admitted to Moss Rehabilitation Hospital for rehabilitative care may subsequently require surgery. Those requiring surgery may receive it at Einstein or may receive it at some other acute care, general hospital. If they receive surgery at some other hospital, they are discharged to that hospital. If they receive surgery at Einstein, they are discharged to Einstein if they remain there for post-operative recovery or treatment. If they receive surgery at Einstein and are returned the same day to Moss Rehabilitation Hospital, they are not formally discharged from Moss Rehabilitation Hospital. The patients of Moss Rehabilitation Hospital who are operated on at Einstein and who receive post-operative care at Moss Rehabilitation Hospital are billed by Moss Rehabilitation Hospital for the surgery.

\*　　\*　　\*　　\*　　\*　　\*

"11. Members of the staff of Einstein are accorded associate staff privileges at Moss Rehabilitation Hospital upon request. (Jeanes Hospital and the American Oncologic Hospital have a similar arrangement.) The Statement of Relationships referred to above provides that the physicians on the staff of Einstein have the privilege of admitting patients to Moss Rehabilitation Hospital and Willowcrest. It is a common practice for physicians on the medical staff of an acute care, general hospital, who are also on the staff of a specialty hospital or an extended care facility, to admit patients

to these specialty hospitals or to extended care facilities. The Medical Staff of Moss Rehabilitation Hospital is selected by Moss Rehabilitation Hospital in accordance with its bylaws. There are three categories of staff membership at Moss Rehabilitation Hospital—active, associate, and honorary. The members of the associate staff must be members of the staff of Einstein or of another affiliated hospital.

\*　　\*　　\*　　\*　　\*　　\*

"22. Moss Rehabilitation Hospital was incorporated in Pennsylvania on July 17, 1959, 'to provide rehabilitation and medical care for chronically ill persons'.

\*　　\*　　\*　　\*　　\*　　\*

"26. Bylaws of Moss Rehabilitation Hospital set forth that the purpose of the corporation is 'to provide physical restoration services for disabled and chronically ill persons through an integrated program of medical, psychological, social and vocational services under competent professional supervision.'

"27. Moss Rehabilitation Hospital is a totally separate corporate entity from Einstein; Moss Rehabilitation Hospital receives none of its operating or other funds from Einstein; the two institutions have separate Boards of Directors with no interlock; and the two institutions have separate Medical Staffs, with each staff organized under separate Staff Bylaws. *See also* No. 11 above.

\*　　\*　　\*　　\*　　\*　　\*

"29. Hospitals are also classified as either (a) short-term acute care hospitals or (b) long-term care hospitals. Short-term acute care hospitals treat patients for diseases or conditions that ordinarily require hospitalization for appreciably shorter periods of time than that required in a long-term care hospital.

"30. Einstein is a general hospital rendering short-term, acute care for patients.

\*　　\*　　\*　　\*　　\*　　\*

"32. Moss Rehabilitation Hospital is a specialty hospital rendering rehabilitative care for its patients.

"33.  Short-term, acute care, general hospitals have organized departments of medicine and surgery.

"34.  Moss Rehabilitation Hospital has no department of medicine or surgery.  Rather, as stated in its Staff Bylaws:

" 'As the Hospital is a specialized hospital to which all patients are admitted for the purpose of rehabilitation, the customary medical departmentalization of a general hospital does not apply as an organizational form.'

"Thus Moss Rehabilitation Hospital is organized in a single department called 'Rehabilitation Medicine'.  However, the Moss Rehabilitation Hospital active and associate staffs together include members from subspecialties of medicine.

"35.  Moss Rehabilitation Hospital has no emergency room and performs no surgery.

"36.  Moss Rehabilitation Hospital would not admit someone who was suffering a heart attack.

\*      \*      \*      \*      \*      \*

"39.  Moss Rehabilitation Hospital is a place where patients go primarily for rehabilitative care, which care is designed to restore a patient to his maximum function.

"40.  At Moss Rehabilitation Hospital:

" 'The Medical Director (is) responsible for the clinical organization of the Hospital and for the supervision of professional therapeutic departments, i. e., physical therapy, occupational therapy, speech therapy, psychology, social service, etc.'

"Some of the psychological services and occupational therapy rendered to patients includes psychological counseling, psychological testing, and vocational evaluation.

"41.  Most of the services referred to in No. 40 above are not offered patients in the average short-term acute care, general hospital.

"42.  Plaintiff Stephen B. Taylor, while a patient at Moss Rehabilitation Hospital, received services, including treatment, from substantially all the therapists referred to in No. 40 above.

\*      \*      \*      \*      \*      \*

"47.  On the basis of information provided by the hospitals themselves, the American Hospital Association (AHA), the national organization for all hospitals in the United States, classifies Moss Rehabilitation Hospital for purposes of service to patients as a rehabilitation facility, and not as a medical and surgical facility.

\*      \*      \*      \*      \*      \*

"49.  The AHA classifies a hospital as either long-term or short-term depending on whether the average length of stay of more than 50% of its patients is 30 days or more, in which event it is classified as a long-term hospital.

"50.  The average length of stay of patients at Moss Rehabilitation Hospital is 28 days, and under the AHA method of classification, Moss Rehabilitation Hospital is classified as a short-term hospital.

"51.  The average length of stay of patients at acute care, general hospitals in the Philadelphia area, according to the Delaware Valley Hospital Council, is approximately 8.5 days.

"52.  On the basis of information provided by the hospitals themselves and verified by the Association, the Hospital Association of Pennsylvania (HAP), the statewide organization for hospitals in Pennsylvania, classifies Moss Rehabilitation Hospital as a long-term rehabilitation hospital; but HAP does not define 'long-term' in relation to the particular number of days for the average length of stay.  The parties hereto do not know what specific criteria HAP utilizes to classify hospitals on the basis of information provided by those hospitals.

\*      \*      \*      \*      \*      \*

"54.  On the basis of information provided by the hospitals themselves, the Delaware Valley Hospital Council (DVHC), the organization of all hospitals in the Greater Philadelphia Area, classifies Moss Rehabilitation Hospital as a long-term, specialty (rehabilitation) hospital; but the DVHC does not define 'long-term' in relation to the particular number of days for the average length of stay.  The parties hereto do not know what specific criteria DVHC uti-

lizes to classify hospitals on the basis of information provided by those hospitals.

\* \* \* \* \* \*

"61. On the basis of surveys, the Regional Comprehensive Health Planning Agency (RCHP), which succeeded to the planning responsibilities of HSC, classifies Moss Rehabilitation Hospital as a long-term, specialty (rehabilitation) hospital."

Referring specifically to the definition of the term "hospital" as used in the policy and quoted in paragraph 70 of the stipulation, supra, it will be noted that the policy expressly lists eight criteria which an institution must satisfy to qualify as a "hospital" and thus qualify for policy coverage. The hospital must:

1. Be a short-term, acute general hospital; and

2. Be primarily engaged in providing diagnostic and therapeutic service to in-patients under the continuous supervision of physicians; and

3. Have organized departments of medicine and major surgery; and

4. Have every patient under the care of a physician; and

5. Have twenty-four hour nursing service under the supervision of a registered nurse (R.N.); and

6. Have a hospital utilization review plan meeting the standards set forth in Section 1861(k) of United States Public Law 89–97 (Medicare); and

7. Be duly licensed; and

8. Not be, "other than incidentally", a place for the aged, drug addicts, alcoholics, rest, convalescence, or custodial, educational or rehabilitative care.

The defendant concedes that Moss meets criteria 2, 4, 5, 6, and 7. It denies that criteria 1, 3 and 8 are met.

In considering the issues thus raised it should be noted that while the parties have agreed upon the long and involved stipulation, requiring a great deal of study, research, effort, and patience, all in an effort to ease the Court's task, they have then proceeded to complicate the task by forthwith diluting the stipulation with affidavits and other exhibits varying some natural inferences flowing from the stipulation and basing conflicting arguments thereon.

For example, considering criterion 1, the defendant, notwithstanding paragraphs 49, 50 and 51 of the stipulation which suggest that Moss is a "short-term" hospital because the average length of stay is less than 30 days, contends, on the basis of its Exhibit 2, that during the relevant period 1974–1975, the average length of stay was 30 days and that Moss was, therefore, a "long-term" hospital.[1] We are reluctant to consider such statistical data dehors the record in determining the "long-term, short-term" issue. Rather on the basis of the stipulation we conclude that Moss qualifies as "short-term" within the terms of the policy.

However, it does not, in our opinion meet the "acute" requirements of the policy. Paragraph 32 of the stipulation recognizes that Moss renders "rehabilitative care for its patients". Obviously, "rehabilitative" care is at the opposite end of the spectrum from "acute" care. "Acute" care suggests a crisis or the need for immediate care and attention, whereas "rehabilitative" care suggests long-term treatment or care designed to restore a patient to his or her former capacity, usually requiring less specialized medical skills of longer duration, although of no less importance to the patient. Illustrating that Moss does not meet the "acute" requirement are paragraphs 35 and 36 of the stipulation stating that Moss "has no emergency room" and would not accept a patient "suffering a heart attack". Thus, we conclude that Moss does not meet the "acute" requirement of criterion 1.

Additionally, criterion 1 requires that the institution be a "general" hospital, whereas paragraph 32 of the stipulation states that Moss is a "specialty" hospital "rendering rehabilitative care". Therefore, assuming that Moss is a "long-term" hospital as contended by plaintiffs, it is not an "acute,

---

[1]. Plaintiffs have also diluted the stipulation by submitting various affidavits.

general hospital" as required by the definitional terms of the policy.

Criterion 3 unequivocally requires that Moss have organized departments of medicine and major surgery. Paragraph 34 of the stipulation states that Moss "has no department of medicine or surgery" much less "organized" departments in those specified fields. Such clear and unequivocal language should quickly and conclusively resolve the issue. Not so. Plaintiffs contend that Moss qualifies under the terms of the policy because while "organized in a single department called 'Rehabilitation Medicine' with active and associate staffs including members from sub-specialties of medicine" (plaintiffs' brief, page 22) and while no surgery is performed at Moss, its patients receive surgery and other required services at the Albert Einstein Medical Center (Einstein), which is physically connected by a corridor to Moss Rehabilitation Hospital." Moss and Einstein have a written statement of relationships coordinating their facilities and services at Einstein when not available at Moss. Plaintiffs rely upon cases such as *Reserve Life Insurance Company v. Marr*, 254 F.2d 289 (9th Cir. 1958); *Reserve Life Insurance Company v. Mattocks*, 6 Ariz. App. 450, 433 P.2d 303 (1967); *Raynor v. American Heritage Life Insurance Co.*, 123 Ga.App. 247, 180 S.E.2d 248 (1971); *McKinney v. American Security Life Insurance Co.*, 76 So.2d 630 (La.App.1955); *Meyers v. Aetna Life Insurance Company*, 39 D & C2d 1, *affirmed*, 207 Pa.Super. 526, 218 A.2d 851 (1966). Relying upon such cases, plaintiffs contend that even though Moss is not departmentalized and does not, in *its* facilities, provide the services in question, such services are provided through its affiliation with Einstein. They thus contend that Moss varies only "in its organizational form" and, therefore, in fact, meets the requirements of the policy.

All this temptingly leads far afield from the real issue. The question is not what services were rendered, the quality thereof, how they were rendered, by whom they were rendered or the organizational background making such services possible at this institution. The issue is whether Moss is a "hospital" within the meaning of that term as defined by the policy. However, a field trip cannot be avoided if one is to follow the cases upon which plaintiffs rely because in none of those cases were the definitional provisions of the policy the same as those here involved nor were they as clear and precise. For example, as defendant points out, in *Meyers* the policy provided:

"The term 'hospital' means only an institution which is engaged primarily in providing, for compensation from its patients, facilities for diagnosis and treatment of bed patients under the supervision of a staff of doctors and which provides the services of registered nurses (R.N.) 24 hours a day. (39 D & C2d at 3).

" * * * the policy in *Meyers* contained no limitation to short-term general hospitals, no requirement of major surgical facilities, and no clause excluding institutions designed primarily for rehabilitative care."

For example, in *Marr* the Court stated:

"There is no requirement in the policies that the insured be confined in a 'general' hospital, nor is there any exclusion from the term 'hospital' of a psychiatric or nursing hospital * * *". (254 F.2d at 290)

Here, the policy contains positive requirements that the "hospital" be a "general" hospital, not primarily devoted to rehabilitative care. Thus, *Marr* is not controlling. For similar reasons other authorities cited and relied upon by plaintiffs are distinguishable or otherwise not controlling and we decline to follow them.

We are thus brought to criterion 8 requiring that "hospital" as defined in the policy not be "other than incidentally" a place for the aged, drug addicts, alcoholics, rest, convalescence or custodial, educational or rehabilitative care. Common sense dictates that any institution dealing with the acute illnesses of the human body must necessarily engage in a certain amount of "rehabilitative care". Full recovery requires both acute care and rehabilitative care. Some institutions are necessarily designed pri-

marily to provide rehabilitative care and it is this type of institution that is not included within the policy here involved. Not excluded is the rehabilitative care which necessarily follows acute treatment and is "incidental" thereto. Both types of institution are desirable and necessary. Insurance policies can be and are written to cover either or both. In the policy here involved "rehabilitative" care other than that "incidental" to acute care is clearly excluded. Turning again to the stipulation of facts, and particularly paragraph 4 thereof, we find "Moss Rehabilitation Hospital is primarily a place for rehabilitative care. (This stipulation does not contain a definition of 'rehabilitative care')."

Plaintiffs stress, by affidavit, that the plaintiff Taylor received specialized treatment at Moss in excess of that normally included in "rehabilitative care" and thus contend that coverage exists. The defendant counters with other evidence such as the deposition of the plaintiff Taylor. Thus, both parties dilute or supplement the stipulation of facts. The Court's task is thus complicated. However, the resulting conflicts do not relate to material facts precluding the proper consideration of the cross-motions for partial summary judgment here filed. Accordingly, on the basis of the entire record before us and giving due consideration to the able presentation of counsel, we conclude that Moss was, as the stipulation unequivocally stated, "primarily a place for rehabilitative care" and, therefore, did not meet criterion 8.

Finally, plaintiffs urge that public policy requires that defendant provide reimbursement to Moss for the hospitalization of the plaintiff Taylor. Considering Taylor's serious and permanent condition and the cost of treatment and rehabilitation, natural feelings and instincts dictate that every effort be made to ease his burdens. But public policy does not so dictate. Rather, public policy dictates that legitimate and unambiguous contracts entered into without fraud, duress, coercion or improper conduct shall be fairly interpreted and enforced.

In *Pennsylvania Manufacturers' Association Insurance Company v. Aetna Casualty and Surety Insurance Company*, 426 Pa. 453, 233 A.2d 548 (1967), the Court, in affirming a judgment on the pleadings on the definition of "insured", quoted approvingly from *Topkis v. Rosenzweig*, 333 Pa. 529, 5 A.2d 100 (1939):

"It is settled that where the language of the policy is clear and unambiguous it cannot be construed to mean otherwise than what it says." (426 Pa. at 457, 233 A.2d at 551).

Other authorities agree. Volume 1 of *Couch on Insurance* 2d § 15:37 states:

"It is the duty of the courts in interpreting insurance contracts to enforce and carry out the contract which the parties have made, without importing anything into the contract by construction contrary to its express terms, or the plain meaning of its terms, or attempting to make a better or different contract. . . . If the terms of the contract are clear and express, the courts cannot extend or enlarge the contract by implication or construction so as to embrace a risk, object, or limitation distinct from that originally contemplated and not included in the express provisions." (1 *Couch* at 709–11)

It is a recognized principle of law that:

"Insurance companies have the same rights as individuals to limit their liability and to impose whatever conditions they please upon their obligations, not inconsistent with public policy or statutory provisions." (2 *Couch on Insurance* § 19:64, at 204)

There are a multitude of types of insurance, each with its own unique provisions, coverage rates and protected risks. The consumer is free to contract for the insurance he wants, but he is not free to expect that because he has an insurance policy, he is protected against all risks.

Regrettably, the treatment at Moss was not covered by the policy here involved. The extended and persuasive arguments advanced by plaintiffs' counsel must fail in the face of the clear and precise provisions of the policy.

We shall grant defendant's motion for partial summary judgment and deny plaintiffs' motion for partial summary judgment.