461 A.2d 269

**Leo R. KAIRYS, M.D., Appellant**

v.

**The AETNA CASUALTY AND SURETY COMPANY, Benjamin A. Trottnow d/b/a Trottnow Insurance Agency, and Arthur D. Tripp, Jr.**

Superior Court of Pennsylvania.

Argued May 20, 1982.

Filed June 3, 1983.

Mark A. Rosenblum, Pittsburgh, for appellant.

Robert B. Brown, Jr., Pittsburgh, for Aetna, appellee.

Lawrence F. Stengel, Pittsburgh, for Trottnow, appellee.

Before HESTER, McEWEN and JOHNSON, JJ.

HESTER, Judge:

Presently before this Court is appellant Dr. Leo R. Kairys' appeal from the judgment of the lower court entered on November 10, 1981.

The facts may be summarized as follows:

Appellant is a physician specializing in the field of obstetrics and gynecology. In connection with his medical practice, he carried malpractice liability insurance written by Medical Protective in the basic amount of $100,000.00. He also carried an excess liability coverage policy with Chicago Insurance Company which covered any excess over $100,-000.00, up to $1,000,000.00. He also carried other insurance including life, general liability, and homeowner's, all of which were handled by various insurance agents.

In January of 1969, appellant was contacted by Arthur D. Tripp, Jr., relative to the possibility of his becoming involved in a Keogh plan. In the course of those discussions, Tripp discussed appellant's entire insurance portfolio with him. Although Tripp did not identify himself as an agent of Aetna Casualty and Surety Company, appellant believed that Tripp wrote insurance for Aetna.

Appellant's dealings with Tripp led to his placing of a number of insurance policies which had previously been serviced by others. During the discussions, Tripp discussed the possibility of writing malpractice liability insurance coverage for appellant. He discussed the matter with his then associate who indicated that he was satisfied with the then existing coverage but that if Tripp could supply an additional $1,000,000 of excess coverage, it should be obtained. There then ensued a series of events which have led to the instant litigation.

Acting on appellant's behalf, Tripp prepared an application for excess coverage of $1,000,000, as well as an application for basic underlying coverage of $250,000. Those applications were signed by appellant, and were forwarded to Trottnow which, in turn, forwarded them to Aetna. Tripp prepared an application for underlying coverage in the amount of $250,000 in the belief that such an application was required in addition to the application for the excess coverage.[1] Aetna issued the policies and sent them to Trottnow who, in turn, sent them to Tripp, along with the billing for the premiums. Appellant was not interested and had never been interested in a basic underlying liability policy in the amount of $250,000 and that policy was never delivered to him. Correspondence then ensued between Tripp and Trottnow in which Tripp informed Trottnow that the 6000 policy had been issued in error and that there was never an intention to apply for such a policy. Tripp further informed Trottnow that since the policy had been issued, he would attempt to convince appellant to accept it. His attempts were unsuccessful and the policy was cancelled.

In addition, through the efforts of Tripp, appellant's Chicago Insurance Company excess policy was cancelled and a short rate return premium check was sent to appellant. Since the scope policy issued by Aetna provided excess coverage in excess of basic liability of $250,000 and the Med Pro policy provided basic underlying coverage of only $100,000, a gap existed in appellant's coverage for any liability between $100,000 and $250,000.

In June of 1973, appellant was sued in an action of trespass alleging medical malpractice. He immediately notified Medical Protective and Aetna. He knew nothing more of this lawsuit until 1978 when he was informed by counsel retained by Med Pro to represent him that the case would soon be coming to trial. It was then that the existence of the gap came to light. The lawsuit in which

1. The underlying policy was referred to in the testimony and will hereinafter be referred to as a 6000 policy and the excess policy as a scope policy.

appellant was defendant resulted in a verdict against him in the amount of $550,000. As hereinabove indicated, the then state of appellant's malpractice liability insurance coverage was such that he would be personally liable for any verdict between $100,000 and $250,000.

As the result of the aforedescribed verdict, appellant instituted an action for declaratory judgment against appellees, Aetna, Trottnow, and Tripp [2] which sought a declaration that the Aetna 6000 policy was in effect and provided a basic underlying coverage up to $250,000.00. He further sought a declaration that each of the appellees breached his or its contractual obligations to appellant and was negligent in effecting the cancellation of the Chicago Insurance Company excess policy and in issuing the Aetna scope policy whose excess constituted an umbrella over $550,000.00 base coverage without determining whether appellant had basic underlying coverage in the amount of $250,000.00, and by attempting to cancel the Aetna 6000 policy.

Trial on this matter commenced on May 8, 1981, nonjury, before the Honorable I. Martin Wekselman. Judge Wekselman, on July 30, 1981, issued an Order whose relevant findings as to this appeal are as follows:

(A) That the Aetna 6000 policy was never in effect and is not now in effect, and that plaintiff is entitled to no coverage thereunder.

(B) That defendant Arthur D. Tripp, Jr., breached his contractual duties to plaintiff and was negligent in failing to exercise the knowledge and skill reasonably expected of him in at least the following particulars: (1) By effecting the cancellation of the Chicago Insurance Company Policy No. 255–001768, $1,000,000 umbrella over $100,000 base coverage and causing to be substituted therefor the Aetna 1062 policy with $1,000,-000 umbrella over $250,000 base coverage without determining whether plaintiff had underlying coverage in the amount of $250,000.

2. Tripp has taken no part in this appeal.

(2) By causing to be issued the Aetna 1062 umbrella policy without determining the amount of coverage provided by Med Pro 434744.

(C) That neither defendant Benjamin A. Trottnow, d/b/a Trottnow Insurance Agency, nor defendant The Aetna Casualty and Surety Company has breached any contractual duty owed to plaintiff or been negligent with respect to any duty owed to plaintiff.

It is from this Order and subsequent reduction to judgment of the declaratory judgment against Arthur D. Tripp, Jr., that appellant has appealed.

Appellant raises two issues on appeal. These are: 1) Whether Trottnow and Aetna are vicariously liable to appellant for the negligence of Tripp? and 2) Whether Trottnow and Aetna were negligent in their dealings with appellant?

Regarding appellant's first contention, appellant contends that our decision in *Sands v. Granite Mutual Insurance Company*, 232 Pa.Super. 70, 331 A.2d 711 (1974) should be controlling as related to our factual situation, while appellee maintains that *Taylor v. Crowe*, 444 Pa. 471, 282 A.2d 682 (1971) is more applicable. In that we believe this to be a "close question", we will engage in a detailed analysis of the above cases and the relevant law in this area.

In *Sands v. Granite Mutual Insurance Company, supra*, Sands came to the Universal Insurance Agency in order to purchase automobile insurance. At that time he told Universal's employee that he wanted "to be fully insured under 10–20 and 5– fully insured ...,"[3] but expressed no preference with regard to which insurance company was selected. Universal was a broker which solicited business for several insurance companies. Since Universal had previously transacted business with Sands on the same automobile, and since none of the relevant circumstances affecting Sands' insurability had changed to the point that additional information would be required, Universal asked

3. These figures represent standard limitations of liability in the policy: $10,000 maximum per person per accident: $20,000 maximum per accident: and $5,000 maximum in property damage per accident.

only that he sign the insurance application form in blank. Sands was willing to permit Universal to fill out the form on the basis of the information they had on file. Universal accepted a premium payment and forwarded the completed application to defendant company, Granite Mutual Insurance Company (Granite) for approval.

Unfortunately, Universal did not explain to Sands that the policy carried a waiver of uninsured motorists coverage. Sands was subsequently involved in an accident. His lack of uninsured motorist's coverage resulted in his being forced to assume a large portion of his medical bills. Alleging a principal-agent relationship between Granite and Universal, Sands instituted suit against Granite seeking to recover that which he would have received had he had uninsured motorists coverage.

Our court, in deciding this issue, engaged in an extensive discussion of agency concepts as they relate to the insurance business. We there stated:

> Granite's principal argument against the existence of authority in Universal to bind them to provide insurance coverage rests upon a distinction more useful in the insurance industry than in the law—the distinction between a broker and an agent.

> The facts developed at trial clearly indicate that in the lexicon of the insurance world, Universal was a broker, and not an agent. From this premise Granite invites us to recognize that, generally speaking, "brokers" represent purchasers of insurance while "agents" represent sellers of insurance. Therefore, according to Granite, Universal was not an agent of Granite, and Granite was not bound by either its acts or failures to act. We reject this facile approach to the resolution of this problem. Whether or not Universal was an "agent" for Granite in the sense in which that term is used by insurance men (i.e., duly licensed as an agent by the state insurance commission), is not particularly relevant. The question is whether the operating agreement between Universal and Granite provided, or appeared to provide, that Universal

could bind Granite subject to Granite's right to expressly reject a policy coverage by seasonably notifying the insured that coverage was refused. As Professor Keeton has stated in criticizing the courts' willingness to employ general descriptions to determine particular relationships in insurance marketing:

"The terminology used in an agency contract is inconclusive and is often inconsistent with the distinctions [between soliciting or special agents and general agents]. It may happen that the agency contract refers to one as a soliciting agent but grants to him, expressly or by implication, limited authority to make contracts for the insurer in particular circumstances. Even if the term "special agent" were reserved to designate such persons, it would be indefinite because of the multitude of possible variations in the authority granted." R. Keeton, *Insurance Law* 22–23 (1971).

The distinction between brokers and agents is no more helpful in ascertaining the extent of Universal's authority to bind Granite in the instant case. In fact, even if we were to determine that Universal was acting in part as an agent for plaintiff in procuring insurance for him, that would not preclude our finding that Universal had simultaneous authority to bind Granite, albeit subject to Granite's not rejecting coverage subsequently. As our Supreme Court has stated:

"[T]he fact that an agent has acted for both parties in the making of a contract cannot have the effect of invalidating the agreement so made when both principals, with full knowledge of the material facts, consented to the double agency." *Rossi v. Firemen's Ins. Co.*, 310 Pa. 242, 165 A. 16 (1932). *See also Restatement of Agency 2d* §§ 391, Comment a, § 392.

The facts developed at trial in the instant case amply demonstrated that Universal had apparent, if not actual, authority to bind Granite, unless and until Granite notified the insured of the denial of coverage and refunded the premium to the extent it was not earned.

510

First, plaintiff's exhibits, which included various application forms, policies and receipts, show that the prior periods of insurance began on April 8, 1966, and April 8, 1967, in both cases running for twelve-month terms. Yet, in neither case were the policies "approved" by the home office on or before April 8th. Usually such approvals did not occur for several weeks after the coverage purportedly began. If we accepted the insurance company's argument that the policies were not in force until approved by the home office, we would necessarily be finding that each year plaintiff purchased three to four weeks of insurance for which he received no coverage—the period of time between the "effective date" of the policy and its approval by the home office.

Second, the plaintiff produced his 1966–67 insurance policy from the records of Granite, which Granite did not repudiate and which listed Universal Insurance Agency as both an "Authorized Representative" and a counter-signatory of the insurance. By permitting Universal to hold itself out as an "Authorized Representative", Granite undercut its argument that Universal did not have at least the apparent authority to bind them to a contract of insurance. Indeed, the applications signed by plaintiff and submitted to Granite in 1966 and 1967 stated that an individual who waived uninsured motorists protection could add such coverage at any time by making an additional two dollar premium payment, the coverage "to take effect when written endorsement is issued by an authorized representative of the company." Thus, the documentary evidence supports the conclusion that "authorized representatives" could bind Granite and that Universal was such an authorized representative.

Finally, the president of Granite, Mr. Easterby, took the stand and admitted that Universal was permitted to set rates and deduct its commission directly from the premium payments as it received them. In fact, compared with the other agencies which transacted business for Granite, Universal stood in a unique relationship—

they were the only brokers who were permitted to establish insurance rates for Granite. Furthermore, in 1966 Universal and Granite both submitted an application to the Insurance Commissioner of the Commonwealth to license Universal as an agent for Granite. Although the insurance commission refused to grant the license, the application itself indicates the close working relationship between Universal and Granite.

As one commentator has suggested: "[W]here a broker holds himself out as a general agent, solicits a policy, collects a premium a part of which he retains as his commission according to his custom, and a policy is issued upon information procured by him, he is an agent of the insurer by implication as to the insured who, in good faith, dealt with him as such." 3 *Couch on Insurance 2d* § 26:25 (1960). *See also Benanti v. Security Ins. Co.*, 222 Mo.App. 763, 9 S.W.2d 673 (Mo.1928); *Mathews v. Marquette Cas. Co.*, 152 So.2d 577 (La.App.1963); *app. denied* 244 La. 662, 153 So.2d 880.

▉ The courts of Pennsylvania have long concurred in this principle. In *Thomas v. Western Ins. Co.*, 5 Pa.Super. 383 (1897), this court stated:

> "It requires no extended discussion or citation of authorities to establish the proposition that a person authorized to deliver a policy of insurance and receive and receipt for the premiums is the agent of the company for that purpose, and the payment of the premium to him is good payment."

Appellees, on the other hand, rely on *Taylor et al. v. Crowe*, 444 Pa. 471, 282 A.2d 682 (1971) in support of their position that Tripp was not acting as their agent. The relevant facts of *Taylor et al. v. Crowe, supra,* are as follows:

Taylor, et al. were the owners of a bowling alley. Crowe and his agency (jointly hereinafter referred to as "Crowe") had been advising Taylor, et al. in connection with the insurance needs of the various businesses in which they were engaged for many years. When their bowling alley

was completed in 1960, Taylor sought comprehensive coverage for both the building and equipment, believing that such coverage would protect them, inter alia, against the perils of landslide. They learned that such coverage was available from the Brunswick Company, from which Taylor had purchased their equipment. However, Crowe represented to Taylor that he could obtain the same coverage offered by Brunswick at a substantially lower premium.

Therefore, Crowe proceeded to place the coverage for both the equipment and the building with a number of insurance companies.

On February 14, 1981, six months after the policies went into effect, a landslide occurred damaging the building and equipment. Contrary to the representations of Crowe, the policies of insurance provided no protection against the risk of landslide.

Taylor subsequently instituted suit against Crowe and the insurance companies through which he placed the Taylor policies. In discussing whether Crowe was the agent of the insurance companies, our Supreme Court noted:

At trial, appellants emphasized that Crowe had a written agency "producer" contract with both members of the Threshermen group. However, at trial, one of the appellants testified as follows:

"Mr. Crowe and his agent was a representative of our company all together. We relied on him to cover us in every phase of our work in the construction field. * * * He had complete charge of our insurance. * * * Our confidence in Mr. Crowe and the Crowe Agency was one hundred per cent as far as insurance was concerned * * * we put all our trust in Mr. Crowe. * * You trust a man to go out and buy you the best insurance you can get. * * * I find out now that there is eight insurance companies involved in this thing * * it didn't concern me where he was getting it [insurance] or who he was getting it from so long as he got it for me * * * that was his business."

On the basis of this testimony, we agree with the trial court that the case comes squarely within the law enunciated in *Taylor v. Liverpool & L & G Ins. Co.*, 68 Pa.Super. 302, 304 (1917):

> "Where a person desiring to have his property insured applies not to any particular company or its known agent, but to an insurance broker, permitting him to choose which company shall become the insurer, a long line of decisions has declared the broker to be the agent of the insured; not of the insurer."

Our conclusion is supported by the discussion found in Couch on *Insurance, 2d* Section 25:95:

> "A broker may be found to have acted on behalf of the insurer in negotiations between the latter and the insured so as to be deemed the agent of the insurer and not the insured * * * but there must be some evidence of an authorization, or some fact from which a fair inference of an authorization by the company might be deduced to make an insurance broker the agent of the company. * * * "

Here, there was no evidence of authorization by the companies that Crowe act as their agent.

In the present case, the relevant facts regarding whether Tripp was an agent of either Trottnow, Aetna, or both, are as follows.

First, while appellant said he knew Tripp to be an "Aetna man", appellant stated that he was not concerned with which company Tripp placed the insurance. Second, the relevant malpractice policies were signed by Trottnow as the "Authorized Representative" of Aetna. Third, Mr. Tripp was paid directly by Dr. Kairys for the malpractice policies and Tripp retained his commission. Fourth, Tripp stated that he was obligated to first offer the insurance coverage to Trottnow before he could proceed to another agency. It is to be noted that there is no dispute that Trottnow is an agent of Aetna and that the arrangement between Tripp and Trottnow resulted in Aetna receiving 98% of Tripp's business. Fifth, while Mr. Tripp stated that

he was referred to the Trottnow Agency by Aetna, he did not have an operating agreement with Aetna. Sixth, Trottnow was not permitted to contact Tripp's customers and any dealings between Trottnow and Tripp's insureds had to proceed through Tripp.

First, regarding whether Tripp was an agent of Aetna, it is to be noted that unlike *Sands, supra,* Tripp did not sign the policies. He was not listed as an "authorized representative" of Aetna. However, like *Sands, supra,* Tripp did deduct his commissions directly from the premium payments as he received them. While the record is devoid of any mention of who established the insurance rates, Tripp did indicate that Aetna had sponsored him for his insurance license, but also stated that this license did not permit him to directly write insurance for Aetna. Also, as in *Taylor, supra,* appellant stated that he did not care with which company Tripp placed his malpractice insurance, just as long as he secured the proper coverage.

■ We find that Tripp was not an agent of Aetna. This finding is based upon the fact that Tripp was not held out as being an "authorized representative" of Aetna and that the appellant did not request any particular company where his insurance was to be placed. He permitted Tripp to make this determination.

■ Whether Tripp was an agent of Trottnow, poses a more difficult question. While Trottnow did not furnish or provide any facilities for Tripp, Tripp, through an agreement with Trottnow, was required to submit his clients' insurance requirements to Trottnow before he was permitted to consult another agent. This was the reason given by Tripp for placing 98% of his business with Aetna through Trottnow. However, we rely heavily upon Tripp's own statements that while he first had to submit his business to Trottnow, in the event he decided the Trottnow offering were unacceptable, he could then proceed to do business with another agency. In addition, Trottnow, in no manner, provided facilities for Tripp nor had personal contact with Tripp's clientele. Therefore, we conclude that Tripp was not an agent of Trottnow.

■ Appellant's final issue concerns whether Trottnow and Aetna were negligent in their dealings with appellant. This contention centers upon both Trottnow's and Aetna's failure to discover the $150,000 gap in his malpractice insurance coverage. Thus, we must determine whether any negligent conduct can be attributed to either Trottnow or Aetna. The evidence establishes that in September, 1970, a representative of Aetna's Personal Accounts Division attempted to ascertain the limits of appellant's underlying liability coverage through Trottnow. Trottnow requested that Tripp identify the policy number, company name and limits of liability of appellant's underlying liability policy. Tripp informed Trottnow and Aetna that the Medical Protective Insurance Company policy number 434744 provided appellant with $250,000 of underlying coverage. Also, it is to be noted that Tripp, through his own negligent conduct caused the Chicago Insurance excess policy to be cancelled thereby creating the $150,000 gap in appellant's coverage. In that both Trottnow and Aetna used reasonable diligence, as described above, in attempting to ascertain appellant's underlying coverage, we conclude that neither Trottnow nor Aetna can be deemed to be independently negligent.

Judgment affirmed.