## RICH MAID KITCHENS, INC.
### v.
## PENNSYLVANIA LUMBERMENS MUTUAL INSURANCE COMPANY.

**RICH MAID KITCHENS, INC., Millcreek Kitchens, Inc. t/a Millcreek Cabinet Corp. and S.M.L. Leasing Company**
### v.
## PENNSYLVANIA LUMBERMENS MUTUAL INS. CO.

Misc. Nos. 85–0359, 85–0360.

United States District Court, E.D. Pennsylvania.

July 18, 1986.

---

Karen Lee Turner, Reading, Pa., for plaintiffs.

Walter R. Milbourne, Philadelphia, Pa., for defendant.

OPINION

CAHN, District Judge.

This action arises from a dispute as to the amount of insurance coverage that was in effect when a fire destroyed the plaintiff's principal place of business. Two proceedings were commenced in state court to establish the amount of the insurance coverage. These two cases were removed to federal court[1] and then consolidated. The defendant filed a motion to dismiss and both parties filed motions for partial summary judgment. After reviewing all of the documents in this case, I conclude that summary judgment should be granted in favor of the defendant insurance company in Count I, which involves the interpretation of the insurance policy. Also, the punitive damages claim in Count III (bad faith settlement of claim) and all of Count V (RICO) of the complaint will be dismissed.

## I. FACTS

The plaintiff, Rich Maid Kitchens, Inc. ("Rich Maid")[2] is a Pennsylvania corporation and, prior to August, 1984, manufactured, sold and distributed kitchen cabinets. Rich Maid conducted their operations at five different locations, with their principal place of business at Route 422 in Wernersville, Berks County.

In the normal course of their business, Rich Maid obtained many types of insurance coverage. Mr. Russel Klotz handled most of Rich Maid's insurance needs, including its casualty and property insurance. When he died in 1972, his son, Richard Klotz, became Rich Maid's insurance agent. Depos. of C. Strickler at p. 4. Initially, Rich Maid's fire insurance had to be brokered out to between 12 and 15 companies because of a capacity problem. As of 1977, the defendant Pennsylvania Lumbermens Mutual Insurance Company ("Lumbermens") began to write a portion of the plaintiff's fire insurance policy. In 1981, Mr. Klotz consolidated the fire insurance coverage into one policy, which was written entirely by Lumbermens. Depos. of R. Klotz at p. 24.

When the plaintiff's fire insurance policy was first written, it provided for coverage based on a scheduled policy. Every insured item was given a monetary value and each item was only insured up to that specific amount. In June of 1981, the coverage was changed to a blanket insurance policy. This type of policy provided complete coverage for any losses on items included in the policy at one or several locations up to the amount of the policy. On May 20, 1983, Rich Maid renewed this insurance policy for another three year period.

Lumbermens wrote this blanket insurance policy with the words "PA. BLANKET" in the upper right hand corner of one of the pages of the policy. On the same page was a space for the identification of all property covered by the policy.[3] The words "as per attached" were typed into this space. Stapled to this page of the policy was a small piece of paper with the following written on it:

---

1. The court has jurisdiction of these two cases under 28 U.S.C. § 1331 and 28 U.S.C. § 1334. The cases were removed from the state court pursuant to 28 U.S.C. § 1452.

2. Two other corporations, Middlecreek Cabinet Corp. and S.M.L. Leasing Co., are named on the insurance policy and are plaintiffs, with Rich Maid, in Misc. No. 85–0360. These two companies are affiliated with Rich Maid. The parties have always considered these two corporations as part of Rich Maid and, for this opinion, the name Rich Maid will include these two corporations.

3. The policy stated: "On all real and personal property, belonging to the assured and or for which they may be legally liable, including property required to be specifically mentioned by the printed conditions of this policy, situate ————."

| LOCATION NO. | AMOUNT | |
|---|---|---|
| 1. | $2,000,000 | S/S Route 422, East of Wernersville, Berks Co., Pa. |
| 2. | 400,000 | N/S of Fort Zeller Rd., Newmanstown, Lebanon Co., Pa. |
| 3. | 50,000 | Rear of 890 Columbia Ave., Sinking Springs, Berks Co., Pa. |
| 4. | 500,000 | N/S Route 422 K/A 633 W. Lincoln Ave., Myerstown, Lebanon Co., Pa. |
| 5. | 2,500 | On the Double-faced sign, approx. 15' × 15' with eight (8) spot or flood lights, located S/S of Route 422, Wernersville, Berks Co., Pa. |
| | $2,952,500 | |

| | |
|---|---|
| Average Fire Rate: | .927 |
| E.C. Rate: | .077 |
| VMM Rate: | .009 |
| All Risk Rate: | .067 |

This list of locations identified all of the property which Rich Maid wanted the insurance policy to cover.

On January 21, 1984, a fire demolished Rich Maid's facility at Wernersville, PA. After the fire, all of the parties held a meeting and it was stated without objection that the policy provided 2 million dollars worth of coverage to the Wernersville facility.[4] The defendant agreed that Rich Maid's policy covered the destroyed property. The defendant began to adjust the claim to determine the amount of the loss. At the request of Mr. Klotz, the insurance company made goodwill advance payments totaling 500,000 dollars to Rich Maid on their claim.

While the defendant was adjusting the claim, the plaintiff considered hiring an adjuster to help them negotiate the insurance claim. Bertram Horowitz, a partner in Young Adjustment Co., discussed his company's services with Rich Maid's officers. In the course of these discussions, Horowitz examined Rich Maid's insurance policy. He suggested that the policy could be interpreted as an overall blanket policy. If this was the interpretation, the insurance coverage applicable to the loss would be over 2.95 million dollars and not 2 million dollars. Depos. of B. Horowitz at p. 11–15. Thereafter, Rich Maid hired Young Adjustment Co. to act as its adjuster on a contingency basis.[5]

The extent of fire damage to the Wernersville facility was much greater than the 2 million dollar insurance coverage.[6] Rich Maid's representative for the insurance claim, Mr. Horowitz, continually asserted in his negotiations that the coverage was an overall blanket policy of 2.95 million dollars. Lumbermens replied that the insurance policy was only a blanket per location policy and not an overall blanket policy.

According to Lumbermens, each location had blanket protection only up to the amount of coverage listed at that location and not for the total amount of coverage in the policy. The purpose of the amounts listed next to each location was to limit the liability at that location to that amount. The total policy amount of 2,952,500 dollars merely showed the total amount of the various blanket per location policies pur-

4. The officers of Rich Maid, Mr. Klotz, representatives of Lumbermens and representatives of the mortgagee bank attended the meeting. Depos. of R. Schlegel at p. 3–7.

5. Rich Maid agreed to pay Young Adjustment Co. one and a half percent of any monies recov-

ered from the insurance company up to 2 million dollars and ten percent of any monies recovered over 2 million dollars.

6. The final estimate of the loss was over 3.5 million dollars.

chased by Rich Maid. For example, under this interpretation of the policy, any loss at location # 3 would be insured only up to 50,000 dollars.

However, if the policy was interpreted as an overall blanket policy as the plaintiff asserts, then any loss at any location, including location # 3, would be covered up to the policy limits of 2,952,500 dollars. According to the plaintiff's interpretation, the reason for the list of monetary amounts next to the various locations was to make sure that Rich Maid was fully insured so that the coinsurance clause would not take effect and limit Rich Maid's recovery. No agreement was reached on this issue and, according to the defendant, this unresolved problem required them to do a lot more work processing the claim before payment could be made.[7]

Due to financial difficulties, Rich Maid filed a bankruptcy petition on July 31, 1984 for protection under the Bankruptcy Act. On August 15, 1984, Lumbermens made a payment of 1.5 million dollars to Rich Maid. Coupled with the advance payment of one-half million dollars, Lumbermens paid the policy limit of 2 million dollars for the loss Rich Maid incurred in the Wernersville fire.

The litigation between these two parties began when Rich Maid brought an action on July 11, 1984 in the Berks County Court of Common Pleas. Two days later, Lumbermens filed a declaratory judgment action against Rich Maid in the Philadelphia Court of Common Pleas. After Rich Maid filed for bankruptcy, these two cases were removed by Rich Maid to this court pursuant to 28 U.S.C. § 1452(a). According to the local rules of the district, this case was immediately referred to the U.S. Bankruptcy Court for further proceedings. After Rich Maid demanded a jury trial on these issues, the case was transferred back to this court by a stipulation of both parties.

Finally, in June of 1985, these two cases were consolidated so as to determine the rights and obligations of both parties under the insurance policy.

Rich Maid's complaint contains five separate allegations. Count I seeks a remedy in the form of a declaratory judgment as to the appropriate interpretation of the insurance policy. Count II is an action for breach of contract. Count III requests damages for the defendant's alleged bad faith in attempting to settle the policy. Count IV is an action for the violation of the Unfair Insurance Practices Act. Finally, Count V alleges a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). After Lumbermens moved for a dismissal of several of the plaintiff's claims, Rich Maid agreed to dismiss Count IV of the complaint. Both parties have now filed motions for partial summary judgment.

The standards of review to be applied in deciding cross motions for summary judgment are the same as those applied when only one party has filed a summary judgment motion. *Selected Risks Insurance Co. v. Schwabenbauer,* 540 F.Supp. 22, 24 (E.D.Pa.1982). Summary judgment is warranted only if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Manetas v. International Petroleum Carriers, Inc.,* 541 F.2d 408, 413 (3d Cir.1976). Since the material facts in the case are undisputed, I am called upon by the parties to decide the legal issues involved in this litigation.

## II. THE AGENCY OF MR. KLOTZ

An issue which must be decided before the insurance policy can be interpreted is the relationship of Mr. Richard Klotz to Rich Maid and to Lumbermens. The determination of Mr. Klotz's status as either an

---

**7.** Without the possibility of an overall blanket policy, the insurance company only had to assess the damage at the Wernersville facility to determine the amount of loss. If the policy were an overall blanket policy, all five locations would have to be examined to determine whether the coinsurance clause of the policy took effect. This clause requires the insurance company to bear only the proportional losses incurred by the insured if the property is not insured for at least 90% of its value. Therefore, all of the plaintiff's property under the policy had to be valued to determine whether the plaintiff was fully insured or, if not fully insured, then to what proportion the insurance would cover the losses.

agent for the insurer or for the insured is critical to any analysis of the insurance policy. If Mr. Klotz is an agent of Rich Maid, then Mr. Klotz's knowledge and actions are binding on Rich Maid. If Mr. Klotz is an agent of Lumbermens, then any negligence on his part would be imputed to Lumbermens.

Mr. Klotz functioned both as an insurance agent and an insurance broker. Generally, an insurance agent is employed by an insurance company and represents the insurer's interests. An insurance broker is not employed by any specific insurance company and acts as a middle man between the insured and the insurance company. The broker solicits the public and then places the requested insurance with a company. A broker is usually an agent for the insured but in some situations can be an agent for the insured in some respects and an agent for the insurer in other respects. 3 *Couch on Insurance 2d* § 25:93–94 (1984).

The law in Pennsylvania on determining the agency status of an insurance broker is based on the case of *Taylor v. Crowe*, 444 Pa. 471, 282 A.2d 682 (1971). In that case, an insurance broker had been advising the insured for many years of his insurance needs for the various businesses in which the insured was engaged. The insured built a bowling alley and wanted to obtain insurance coverage, including protection against landslides. The insurance broker assured the insured that he would be protected and placed the coverage with a group of six insurance companies through the insurance group's agent. When a landslide damaged the building several months later, it was determined that the policy did not provide protection against landslides. The insured brought suit against the group of insurance companies and the insurance broker based on a theory of negligent misrepresentation as to the extent of the insurance coverage. The trial court directed a verdict in favor of the insurance companies because there was insufficient evidence that the insurance broker was acting as an agent for the insurance companies. *Id.* at 472–74, 282 A.2d at 682–83.

On appeal, the Supreme Court of Pennsylvania affirmed the lower court's decision. Testimony at trial showed that the insured trusted the insurance broker and relied on that broker to procure their insurance from whichever insurance company they thought was best. On the basis of that testimony, the court found the precedent of *Taylor v. Liverpool & L&G Ins. Co.*, 68 Pa.Super. 302 (1917) to be controlling.

> Where a person desiring to have his property insured applies not to any particular company or its known agent, but to an insurance broker, permitting him to choose which company shall become the insurer, a long line of decisions has declared the broker to be the agent of the insured; not of the insurer.

*Crowe*, 444 Pa. at 475, 282 A.2d at 683 (citing *Taylor* at 304). The court also stated that for a broker to be found to be an agent of the insurer there must be some evidence which could be inferred as an authorization by the company to the broker. Since no evidence of any authorization existed, no agency relationship could be established between the broker and the insurance companies. *Crowe*, 444 Pa. at 475, 282 A.2d at 683–84.

Another case which deals with the same issue of whether a broker is an agent for the insured or for the insurer is *Sands v. Granite Mutual Insurance Co.*, 232 Pa.Super. 70, 331 A.2d 711 (1974). In *Sands*, the plaintiff went to an insurance broker to obtain auto insurance. The plaintiff said he wanted to be fully insured but expressed no preference with regard to any specific insurance company. The broker accepted payment and forwarded the money and application to the Granite Mutual Insurance Company ("Granite"). When the plaintiff got into an accident with an uninsured motorist and tried to collect on his policy, he was informed by Granite that they had no record of his having insurance with the company. The plaintiff argued that the insurance broker was an agent for the insurer and had the authority to bind

them. The plaintiff's injuries exceeded the policy limits, so the jury awarded the plaintiff the maximum amount of the insurance policy as damages. *Id.* at 72–75, 331 A.2d at 712–14.

The insurance company appealed and argued that the broker was not their agent and could not bind them to provide insurance coverage. However, the appellate court found that the evidence admitted at trial amply demonstrated that the broker had apparent, if not actual, authority to bind Granite. The court found that this evidence of authority made this case substantially different from the *Crowe* decision. Also, the court held that

> "[W]here a broker holds himself out as a general agent, solicits a policy, collects a premium a part of which he retains as his commission according to his custom, and a policy is issued upon information procured by him, he is an agent of the insurer by implication as to the insured who, in good faith, dealt with him as such." *3 Couch on Insurance 2d* § 26:25 (1960).

*Id.* at 78, 711 A.2d at 715–16. Thus, the Pennsylvania court found that the insurance broker was Granite's agent and the court affirmed the jury's award.

The most recent case on this issue involved a situation where the *Crowe* and *Sands* precedents seem to conflict. In *Kairys v. Aetna Casualty and Surety Company,* 314 Pa.Super. 502, 461 A.2d 269 (1983), a doctor was approached by an agent named Mr. Tripp concerning a Keogh plan. After examining the doctor's insurance, Mr. Tripp, who seemed to be an agent for Aetna insurance company, suggested the possibility of writing the doctor's malpractice insurance. The doctor agreed to purchase some excess insurance from Mr. Tripp. However, Tripp cancelled some of the doctor's old policies and left the doctor with a gap in his malpractice insurance coverage. Several years later, the doctor lost a malpractice suit and the doctor was held personally liable for the amount of the gap in his malpractice policies. The doctor brought an action against the agent and

the insurance company. The court found that only Mr. Tripp breached his duties to the doctor. The doctor appealled that judgment. *Id.* at 504–07, 461 A.2d at 270–72.

The Pennsylvania appellate court quoted extensively from both the *Crowe* and the *Sands* decisions. The court took note that Tripp deducted his commissions from the premium payments, as in *Sands*, but that the doctor did not care which insurance company handled his coverage, as in *Crowe*. The court concluded that Tripp was not an agent of Aetna because Tripp was not an "authorized representative" of Aetna and because the doctor did not request any particular company to provide the insurance coverage. *Id.* at 514, 461 A.2d at 276.

Although the determination of whether a person is an agent is usually a question of fact for the jury, the present situation has insufficient evidence to submit to the jury the question of Mr. Klotz's agency. Mr. Klotz has had a personal relationship with the officers of Rich Maid for many years and has handled most of their insurance business for many years. In their depositions, the officers of Rich Maid all agreed that Klotz was their insurance agent. For example, William Martel, treasurer of Rich Maid, stated at his deposition:

Q. Do you have any recollection as to what instructions you gave Mr. Klotz?

A. The only recollection I would have with any dealings with Mr. Klotz was that he was our insurance agent. I felt that if we left everything in his hands that he would make sure we were adequately protected, because we were paying our premiums the same, and like I say, he had several insurances.

He had our car insurances, our fleet insurance—car insurance. I couldn't say specifically, no sir....

. . . . .

Q. Who would be the person must likely to review it if it were ever reviewed? Mr. Strickler?

A. I don't think it was ever reviewed. After we talked to Mr. Klotz, like I say, we

had faith in Mr. Klotz that he would have us adequately covered, and I don't know if he ever sat down and actually reviewed them. Insurance wasn't our forte. It was a lot of—

Depos. of W. Martel at p. 9–12. *See also* Depos. of C. Strickler at p. 4–11; Depos. of R. Schlegel at p. 53–55.

Moreover, Rich Maid never requested that Klotz place the insurance with any specific company. The officers of Rich Maid relied on Klotz to procure the necessary insurance coverage from whichever insurance company Klotz wanted. "Whatever policy he delivered was fine by us" is how Rich Maid's president described Klotz's function. Depos. of C. Strickler at p. 10.

Although Klotz was an insurance agent for some other insurance companies, he was not an authorized agent for Lumbermens. Depos. of R. Klotz at p. 39. There is no evidence which suggests that Rich Maid thought that Klotz was an agent for Lumbermens. To the contrary, all of the evidence showed that Klotz was not an agent for the defendant. For example, when talking about the changes in the insurance policy up for renewal in 1983, Klotz told Rich Maid's officers that he could not give them a cost until he submitted it to the company. Depos. of R. Schlegel at p. 51. Or, when Klotz recommended that some of Rich Maid's buildings be reappraised, Rich Maid suggested that Lumbermens should pay for the reappraisal. Klotz did not act as an agent for Lumbermens but wrote a letter to Lumbermens, requesting that they pay for the appraisal. Depos. at R. Klotz at p. 41–42.

Finally, evidence that Klotz collected the premium payments from Rich Maid does not change his agency status. Initially, this collection of monthly payments was for Rich Maid's benefit. *See* Depos. of C. Strickler, p. 11–12. Also *Kairys* held that collecting payments is not determinative of a broker agency status. Even in *Sands*, the court's decision was based more on the fact that the broker had apparent or actual authorization from the insurance company than on the fact that the broker had received the insured's payments. At most, one could argue that Klotz was an agent for Lumbermens in his function of collecting premiums from Rich Maid. But, this would have no effect on his status as an agent of Rich Maid's in procuring the insurance policy.

In its briefs, the plaintiff has argued that it relied on Mr. Klotz as a skilled insurance agent to provide the appropriate coverage for their company. Also, the plaintiff states that Mr. Klotz was an agent of Lumbermens, as demonstrated by Klotz's adverse testimony concerning the amount of insurance coverage. Even construing this information in a light most favorable to the plaintiff, it does not refute Klotz's agency relationship with Rich Maid. The plaintiff has produced no evidence which even suggests that Klotz was an agent for Lumbermens before the loss occurred. Klotz's actions after the fire cannot affect his agency status at the time the insurance policy was negotiated. At most, a jury could decide that, while the claim negotiations occurred, Klotz was an agent for Lumbermens. It is not necessary for the court, in this case, to make any determination as to Klotz's agency status after the fire or as to Mr. Klotz's skill and knowledge as an insurance broker.

Therefore, applying *Crowe* and *Kairys*, I find that Klotz was an agent for Rich Maid in procuring insurance from Lumbermens. This determination has an impact on the contractual aspects of this insurance policy. All of the laws and legal relationships of agency law apply to Mr. Klotz and Rich Maid. For example, any consent by Mr. Klotz, within the scope of his agency relationship with the company, would also be binding on Rich Maid. 3 *Couch on Insurance 2d.* § 25:24. Any information which Mr. Klotz knew at the time of the contract is now imputed to Rich Maid. *Id.* at § 25:27. After this relationship between Klotz and Rich Maid has been established, it is now possible to examine the other disputed issues in this case.

## III. INTERPRETATION OF INSURANCE POLICY

■ The crux of this litigation concerns the interpretation of the type of insurance policy defendant issued to Rich Maid. Neither party questions the fact that the policy was a blanket insurance policy. The parties disagree, however, as to whether the policy is an overall blanket policy, covering all five Rich Maid locations with a 2,952,500 dollar limit on the policy; or a blanket per location policy, with coverage at each location limited to the amount listed next to each location on the small paper attached to the policy. When the facts are not in dispute, the determination of the proper coverage of an insurance policy is a question of law. *Pacific Indemnity Company v. Linn*, 766 F.2d 754, 760 (3d Cir.1985). Because the only issue in dispute is the extent of coverage provided by the policy, there is no need to submit this issue to a factfinder.

The plaintiff makes several arguments in favor of their position that the insurance policy is an overall blanket policy. Initially, Rich Maid argues that the language of the policy is clear and unambiguous. Also, the plaintiff stated that the custom in the insurance industry is that blanket insurance policies are overall policies unless specifically noted otherwise. This custom should be probative of the correct interpretation of the contract. In support of their position, the plaintiff relies heavily on *Reliance Insurance Co. v. Orleans Parish School Board*, 192 F.Supp. 524 (E.D.La. 1961), *aff'd*, 322 F.2d 803 (5th Cir.1963), *cert. denied*, 377 U.S. 916, 84 S.Ct. 1180, 11 L.Ed.2d 186 (1964).

Alternatively, the plaintiff argues that the insurance policy is ambiguous. Any ambiguity in the policy should then be construed against the insurance company because insurance contracts are contracts of adhesion. *Daburlos v. Commercial Insur-ance Company*, 521 F.2d 18 (3d Cir.1975). No extrinsic evidence should be admitted by the court to resolve the ambiguity since any ambiguity is automatically construed against the insurance company. *Id.* at 26. Therefore, the plaintiff contends that this court must construe the insurance policy as an overall blanket policy.

The defendant also has several arguments as to why it is entitled to summary judgment. Lumbermens argues that the plain meaning of the policy is clear and unambiguous and can only be interpreted as a blanket per location policy. The limitation of an amount at each location can only be interpreted as establishing a blanket policy for that amount at each of Rich Maid's five locations. The defendant factually distinguishes the *Reliance Insurance Co.* case from the present controversy.[8] Finally, the insurance company contends that even if the insurance policy is ambiguous, the court should determine the mutual intent of the parties to remove the ambiguity. The defendant cites Judge Huyett's opinion in *Harbor Insurance Co. v. Lewis*, 562 F.Supp. 800 (E.D.Pa.1983) in support of this position.

■ In establishing a framework to resolve this dispute, I am compelled to rely on my opinion, written while sitting by designation on the Third Circuit Court of Appeals, in *Mellon Bank N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir.1980). In that case which applied Pennsylvania law to a contract dispute, the appellate court explained the procedure for interpreting ambiguous contracts. Although the present controversy is somewhat different because it involves an insurance contract, which is a contract of adhesion, the general principles of contract law are still applicable to insurance contracts. *See Blair v. Berkshire Life Insurance Co.*, 429 F.2d 996, 1000 (3d Cir.1970).

---

**8.** Although the *Reliance Insurance Co.* decision does deal with similar issues, I agree with the defendant that the facts of that case distinguish it from the present controversy. In that case, the question was whether the policy was a blanket or a scheduled policy. Also, the written terms of the policy were clear that a blanket policy was in effect. Also, as will be explained later in this opinion, the existence of extrinsic evidence in the present controversy distinguishes this case from the *Reliance Insurance Co.* case.

■ The *Mellon Bank* court analyzed the entire contract making process:

"In construing a contract, a court's paramount consideration is the intent of the parties." *O'Farrell v. Steel City Piping Co.*, 266 Pa.Super. 219, 403 A.2d 1319, 1324 (1979). It would be helpful if judges were psychics who could delve into the parties' minds to ascertain their original intent. However, courts neither claim nor possess psychic power. Therefore, in order to interpret contracts with some consistency, and in order to provide contracting parties with a legal framework which provides a measure of predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent.

*Mellon Bank*, 619 F.2d at 1009.

The strongest objective manifestation of the agreement between the parties is the words they use in their written contract. For that reason, courts will not deviate from the clear and unequivocal meaning of a written contract. However, "external indicia of the parties' intent other than the written word are useful, and probably indispensable, in interpreting contract terms." *Id.* at 1010. Therefore, the appellate court held that a judge should not be bound by a strict "four corners of the contract" approach in determining whether an ambiguity exists in a contract. Rather, the judge should hear all of the objective evidence offered by the parties and then determine whether the terms of the contract are susceptible to different meanings.

■ Applying these principles to the present controversy, I must first examine the written contract and make a determination whether its terms are clear and unequivocal. Each party argues in their briefs that the language of the insurance policy is plain and that no ambiguity exists in the policy. Each party presents proof of the correctness of their interpretation from the language of the policy and requests summary judgment.

■ A provision of an insurance policy is ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning. *Northbrook Insurance Co. v. Kuljian Corp.*, 690 F.2d 368, 372 (3d Cir. 1982); *Celley v. Mutual Benefit Health and Accident Assoc.*, 229 Pa.Super. 475, 481–82, 324 A.2d 430, 434 (1974). This conflict between the litigants as to the plain meaning of the insurance policy provides sufficient proof that an ambiguity exists in the policy. The words "PA BLANKET" in the corner of one page of the policy can be construed as suggesting either an overall blanket policy or a blanket per location policy. The list of locations and amounts of money could be a limitation for a blanket per location policy or could be an estimate of the location's value for the coinsurance clause of an overall blanket policy. The terms of the insurance policy could be honestly interpreted in two different ways and the contract is therefore ambiguous.

The plaintiff next argues that, once the court has found an ambiguity in the insurance policy, extrinsic evidence should not be admitted for the court's examination to help resolve the ambiguity. Since the ambiguity is automatically construed against the insurance company, there is no reason to examine this evidence. While the legal principles stated by the plaintiff are valid, the application of these principles at this point in the analysis is misplaced.

■ To understand why these principles should not be applied, a distinction must be made between the types of ambiguous contracts. An ambiguity is defined as:

Intellectual uncertainty; ... the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time ... Webster's Third New International Dictionary (unabr. 1971).

*Mellon Bank*, 619 F.2d at 1011.

However, just because the language of a contract is ambiguous does not mean that

the parties are in conflict over the terms of the agreement. For example, if a contract calls for the delivery of a certain number of pounds of caviar, the contract could be ambiguous because caviar dealers always define a pound of caviar as 14 ounces while the rest of the world defines a pound as 16 ounces. A caviar contract between two caviar dealers is ambiguous because the word pound has two different meanings. However, the intent of the parties is clear in that both parties were referring to a 14 ounce pound. Although the language may suggest two separate meanings, the parties had a meeting of their minds and were clear as to the terms of the caviar contract. *See Mellon Bank*, 619 F.2d at 1012 n. 12. This type of ambiguous contract is very different from the type of ambiguous contract where the two parties never had a meeting of the minds as to the exact term in conflict. When the ambiguity prevents a meeting of the minds, then the court should apply the various rules of construction to decide which of the two possible meanings is appropriate.

This distinction is explained in *Hodgins v. American Mutual Liability Insurance Company*, 261 F.Supp. 129 (E.D.Pa.1966). The plaintiff was injured by a product purchased in a store which had gone bankrupt. The plaintiff sued the bankrupt's insurance company and the question arose whether the policy covered the hazard of products liability. The plaintiff argued that the policy was ambiguous and that this ambiguity should be construed against the insurer. In denying the plaintiff's motion for summary judgment, Judge Lord, III, wrote:

> We feel compelled to comment upon what at first blush appears to be a conflict between a procedural imperative and the widely-held doctrine of construing insurance policy ambiguities against the insurer. If we were to hold that the mere existence of a judicially determined ambiguity demands judgment against the insurer, we would be ignoring completely the rationale for the rule of construction. Insurance policies and other contracts of adhesion are construed strictly and against their author when there is doubt

> as to what the parties themselves intended. However, this construction can only be invoked when, upon a full consideration of the facts, the intent of the parties is still obscure. Only then, should we place the consequences of the ambiguity upon the party who chose the words. If we were to ignore extrinsic evidence of what the parties intended the net result would be to place in jeopardy every insurance contract in which words of art peculiar to that or similar transactions were employed. This result would be especially unfortunate in situations like the present one where the allegation of an ambiguity in the contract is raised by a third party. (Citations omitted)

*Id.* at 130–31. *See also Consolidation Coal Co. v. Liberty Mutual Insurance Co.*, 406 F.Supp. 1292, 1296 (W.D.Pa.1976) (also quoting Judge Lord).

Another case which demonstrates this difference is *Home Insurance Co. v. Monaco*, 405 F.Supp. 321 (E.D.Pa.1975), *aff'd*, 544 F.2d 512 (3d Cir.1976). The issue in that case was whether, under Pennsylvania law, an insurance policy's specific denial of coverage for an insured's spouse also denies coverage for his widow. After her husband's death in a car accident, the wife attempted to recover from the insurance company for her own injuries sustained in the same accident. The insurance company initiated an action to get a declaratory judgment that it was not obligated to compensate the widow for her injuries. The widow argued that the failure of the insurer to include the word widow in the exclusionary clause created an ambiguity which must be construed in her favor. *Id.* at 322. The district court allowed extrinsic evidence to be admitted and then concluded that the clause was not ambiguous. Even if the policy was ambiguous, the court found that neither of the parties intended to allow a widow to recover in this situation. Therefore, the insurance company's motion for summary judgment was granted. *Id.* at 324–25.

This distinction also explains the court's decision in *Harbor Insurance Co. v. Lewis,*

562 F.Supp. 800 (E.D.Pa.1983), a case cited in the defendants' briefs. The judge in *Harbor* found the insurance endorsement ambiguous and then allowed extrinsic evidence of the circumstances surrounding the making of the contract. *Id.* at 803. That information demonstrated that the mutual intent of the parties at the time of the making of the contract was very clear. The court interpreted the insurance endorsement in the same way as the parties intended and did not apply the rule of construction which would have construed the policy against the insurer. Only if the ambiguity caused the parties to the contract to have two different meanings as to the terms of the contract would the insurance clause be construed against the insurer. *See also Travelers Indemnity Co. v. Erie Insurance Exchange*, 510 F.Supp. 261 (W.D.Pa.), *aff'd*, 673 F.2d 1302 (3d Cir. 1981); *Celley v. Mutual Benefit & Health & Accident Assoc.*, 229 Pa.Super. 475, 324 A.2d 430 (1974).

This differentiation between the types of ambiguity makes sense. As many courts have stated, a contract provides an external sign of the mutual intent of the parties. If the contract does not unequivocally explain the mutual agreement of the parties, then the court must examine extrinsic evidence to determine the parties' intent.

When a term in an insurance policy is ambiguous and the intention of the parties therefore cannot be discerned from the policy, the court may attempt to arrive at a construction that seems reasonable and in accord with the parties' apparent intention as revealed by extrinsic evidence of the purpose of the insurance, its subject matter, the situation of the parties, and the circumstances surrounding the making of the contract. If more than one reasonable construction exists, the construction that favors coverage must be applied.... However, where an ambiguity can be removed by an interpretation placed upon the language by the parties, this approach does not apply. Rather, the parties' interpretation will govern. (Citations omitted).

*Celley*, 229 Pa.Super. 475, 482–83, 324 A.2d 430, 434–35.

 In the case at hand, all the extrinsic evidence shows that the mutual intent of the parties was clear. All of the parties to the original insurance policy and the subsequent renewals believed that the policy was a blanket per location policy. None of the extrinsic evidence suggests that the policy is an overall blanket policy.

Initially, Rich Maid's coverage was a scheduled policy. When it was changed to a blanket policy in 1981, a memorandum was sent from Lumbermen's field representative to the company. The memorandum requested a change in Rich Maid's scheduled policy to a "Blanket Real and Personal each location" policy. *See* Klotz Ex. # 12. A copy of this memo was also sent to Klotz's Insurance Agency. It is this policy, which was renewed in 1983, which the court must now interpret. Since no evidence has been submitted which suggests that changes were made in the type of basic coverage, it can be inferred that the renewed policy was also a blanket per location policy.

 Although the officers of Rich Maid were not parties to the contract negotiations, Rich Maid's insurance agent, Richard Klotz, was a party to the agreement. His knowledge as to the meaning of a phrase in a policy is sufficient to bind Rich Maid to that interpretation. 3 *Couch on Insurance 2d* § 25:27. Mr. Klotz stated that "[i]t was my firm understanding that the policy was written blanket per location." Depos. of R. Klotz at p. 25. Even though Rich Maid's officers had little knowledge of the exact terms of the policy, this does not excuse them from being bound by the negotiated terms of the agreement. They relied on their agent, Mr. Klotz, to provide them with adequate insurance coverage and they are bound by the insurance policy procured by him.

Finally, evidence of the meetings held after the fire show that all parties agreed that the insurance coverage at Wernersville was two million dollars. It was only when Mr. Horowitz examined the policy

and concluded that the policy could possibly be read as an overall blanket policy that this issue was raised. This demonstrates that all of the parties to the policy understood the policy to be a blanket per location policy.

■ The interpretation of this insurance policy should not be affected by flaws in the written word. Just because a third party, such as Mr. Horowitz, determines that the words of the policy are ambiguous many months after the policy has been renewed should not change the mutual intent of the parties. One party should not receive a windfall based on a term not bargained for in the agreement merely because the written words of the agreement could, by an outside observer, have more than one meaning.

With the intent of the parties clear, I find that this insurance policy must, as a matter of law, be interpreted as a blanket per location policy. The policy is limited at each location by the listed monetary amount. The limit of the insurance policy at the Wernersville facility was 2 million dollars. Therefore, I grant summary judgment to the defendant Lumbermens in the declaratory judgment action in Count I of this litigation.

## IV. OTHER CLAIMS

The defendant has also filed a motion to dismiss Counts III and V of the complaint. A motion to dismiss should only be granted if it appears to a certainty that no relief can be granted under any set of facts which could conceivably be proved. *D.P. Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943 (3d Cir.1984).

Rich Maid alleges in Count III of the complaint that the defendant willingfully, wrongfully and illegally attempted to coerce Rich Maid into settling the insurance claim. The plaintiff alleges that the insurance company refused to pay any part of the proceeds until the dispute concerning the policy limits was resolved. The plaintiff requests that punitive damages be awarded for this bad faith behavior.

The Pennsylvania Supreme Court has ruled that punitive damages cannot be awarded for the bad faith settlement of an insurance claim. In *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, 494 Pa. 501, 431 A.2d 966 (1981), the Court concluded that the state legislative passed the Unfair Insurance Practices Act to prevent an insurance company's bad faith conduct. The legislative established various sanctions to deter bad faith conduct and it is not for the courts to impose sanctions beyond what the legislative enacted. Therefore, the *D'Ambrosio* court held that it was unnecessary to create a new tort for the bad faith settlement of insurance claims. Also, the court held that punitive damages, which are awarded to deter bad faith conduct, should not be awarded. *Id.* at 509, 431 A.2d at 970. The defendant asserts that this precedent bars the plaintiff's claim for punitive damages arising from the bad faith settlement of the claim.

The plaintiff attempts to distinguish the *D'Ambrosio* case from the case at bar. The plaintiff argues that *D'Ambrosio* only held that the courts should not create a new tort for the bad faith settlement of an insurance claim. The present case requests punitive damages based on the common law tort theories of misrepresentation, fraud and the tortious interference of a business relationship. Therefore, punitive damages can be awarded to the plaintiffs.

The plaintiff's attempt to limit the *D'Ambrosio* decision is supported by some case law. *See Olkowski v. Prudential Insurance Co.*, 584 F.Supp. 1140, 1142–43 (E.D. Pa.1984); *Security Insurance Co. v. Bou-Mer-Fran Coal Inc.*, No. 81–1092, slip op. (W.D.Pa. Dec. 1, 1982) [Available on WESTLAW, DCTU database]. Other judges have held that the *D'Ambrosio* decision stands for a much broader proposition that prevents plaintiffs from bringing even common law tort actions based on the bad faith settlement of an insurance claim. *See Smith v. Fireman's Fund Insurance Co.*, 575 F.Supp. 69, 70 (E.D.Pa.1983). Finally, some courts have allowed a plaintiff to allege a common law tort action but have

held that *D'Ambrosio* prevents punitive damages from being awarded for outrageous conduct arising from that tort action. *See generally Keene Corp. v. Insurance Co. of North America*, 597 F.Supp. 934 (D.C.D.C.1984); *Starkey v. Minnesota Mutual Life Insurance Co.*, No. 82–2192, slip op. (E.D.Pa.1982).

 I believe that this last approach is the correct interpretation of the *D'Ambrosio* decision. If punitive damages could be awarded based on a common law tort action, then the holding of *D'Ambrosio* could easily be circumvented. Rather than utilize the procedure established by the state legislature, any plaintiff could package his bad faith settlement claim as a common law tort action and request punitive damages. On the other hand, I do not think the legislature wanted to eliminate a plaintiff's causes of action in tort law merely because the claim involves an insurance policy. It seems clear that *D'Ambrosio* stands for the proposition that the courts should not attempt to deter this bad faith conduct when the legislature has already established deterrents which the legislature believes are adequate. Therefore, Rich Maid will be allowed to proceed with its claims of fraud, misrepresentation and the tortious interference of a business relationship against Lumbermens. However, any claim for punitive damages based on these common law torts will be dismissed.

 In Count V, the plaintiff alleges that the defendant committed a violation of RICO and requests treble damages. For a person to be able to bring a civil action in RICO, that person must have been "injured in his business or property by reason of a violation of § 1962." 18 U.S.C. § 1964(c). Although Rich Maid has not pleaded which subsection of § 1962 Lumbermens violated, Rich Maid's claims do not fit under any subsection of § 1962.

Section 1962(a) declares it unlawful for any person to use or invest money obtained from a pattern of racketeering. Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering. For

Rich Maid to be able to bring a civil action under one of these two subsections, it must have suffered an injury by reason of a violation of these subsections. Rich Maid does not allege that it suffered an injury from the use or investment of money obtained from a pattern of racketeering activities or from the acquisition of an interest in an enterprise through a pattern of racketeering. An allegation that Rich Maid was injured from the pattern of racketeering and not from the violation of § 1962 is not sufficient for the casual relationship required by § 1964(c). *See Gilbert v. Prudential-Bache Securities*, 643 F.Supp. 107 (E.D.Pa.1986). Therefore, Rich Maid does not have standing under subsection (a) or (b) of § 1962 to bring a civil RICO action.

 Rich Maid concedes that it did not allege a separate person and enterprise in its complaint. This is a necessary requirement for a violation of § 1962(c). *See B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3d Cir.1984). Rich Maid has not alleged all of the requirements of a violation of § 1962(c) and it cannot bring this action under that subsection. Finally, § 1962(d) makes it unlawful to conspire to violate subsections (a), (b) or (c) of § 1962. Since Rich Maid has not alleged a valid claim under one of the other subsections, it is not possible to state a claim under subsection (d).

Alternatively, Rich Maid's RICO claims should be dismissed for not sufficiently alleging a pattern of racketeering. In defining this requirement, the Supreme Court stated that:

"The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' ... The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern."

*Sedima, S.P.R.L. v. ImRex Co.,* —— U.S. —— at n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). The *Sedima* court did not explain the parameters of this continuity plus relationship and left it up to the lower courts to define this requirement.

 The Eighth Circuit Court of Appeals decision in *Superior Oil v. Fulmer,* 785 F.2d 252 (1986) further defined this continuity plus relationship for a pattern of racketeering. It established a two prong test of relationship and continuity to show that a pattern of racketeering exists. For continuity to be established, the plaintiff must show that the defendant has done these activities in the past or that they were engaged in criminal activities elsewhere. One isolated fraudulent scheme, even if containing more than one fraudulent act, is not enough to have a pattern of racketeering. *Id.* at 257.

Although the Third Circuit Court of Appeals has not defined the concept of a pattern of racketeering, *see Malley-Duff & Assoc. v. Crown Life Insurance Co.,* 792 F.2d 341, 353 n. 20 (3d Cir.1986), I believe that the *Superior Oil Co.* decision is very persuasive and should be adopted as the law in this district. Therefore, because Rich Maid has failed to establish any other past or present criminal activities of Lumbermens, they have failed to show a pattern of racketeering activities. The single isolated event of Rich Maid's policy dispute, even though allegedly consisting of more than one fraudulent act, is not sufficient to show a pattern of racketeering. Thus, for all of the above reasons, Rich Maid's RICO claim must be dismissed.[9]

### ORDER

AND NOW, this 17 day of July, 1986, upon consideration of all of the outstanding motions, it is hereby ORDERED:

1. Summary Judgment is granted to the defendant Lumbermens Mutual Insurance Co. on the declaratory judgment action in Count I.

2. The claim for punitive damages in Count III of the complaint is DISMISSED.

3. Count V of the complaint is DISMISSED.

4. All other motions are DENIED.

---

9. Count II of the complaint alleges a breach of contract by Lumbermens. Neither party has requested summary judgment on this issue. The record is not complete on this issue and it seems that some factual duties may be in dispute. Therefore, this issue cannot be resolved until the litigation has proceeded further.